

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-2007

# USA v. Lakhani

Precedential or Non-Precedential: Precedential

Docket No. 05-4276

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Lakhani" (2007). *2007 Decisions.* Paper 1384.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1384

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  05-4276
_____

UNITED STATES OF AMERICA

v.

HEMANT LAKHANI,

Appellant

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 03-cr-00880)
District Judge: Honorable Katharine S. Hayden

_____

Submitted Under Third Circuit LAR 34.1(a)
November 28, 2006

Before: RENDELL and AMBRO, <u>Circuit Judges</u>
PRATTER,[*] <u>District Judge</u>

_____

[*]Honorable Gene E.K. Pratter, United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

(Opinion filed: March 16, 2007)

Henry E. Klingeman, Esquire
Anna G. Cominsky, Esquire
Klingeman Law
10 James Street
Florham Park, NJ   07932

      Counsel for Appellant

Christopher J. Christie
   United States Attorney
George S. Leone
   Chief, Appeals Division
Sabrina G. Comizzoli
   Assistant U.S. Attorney
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ   07102

      Counsel for Appellee

------------

OPINION OF THE COURT

------------

AMBRO, <u>Circuit Judge</u>

Helmant Lakhani appeals his conviction by a jury on five

2

charges for his role in the attempted importation of shoulder-fired, surface-to-air missiles.[1] He received a sentence of 47 years in prison. Lakhani claims entrapment by the Government and a violation of constitutional due process stemming from its investigation. He also asserts error relating to juror misconduct during his trial as well as the unreasonableness of his sentence. We conclude that a reasonable juror could have found that Lakhani was not entrapped and that the District Court was correct in ruling that the Government's law enforcement efforts did not offend due process. We also perceive no error in the Court's ruling regarding juror misconduct or in the sentence it imposed.

## I. Facts

Lakhani, now 71 years old, was born in India but resided in London. He was a trader (*i.e.*, a "middleman") and didn't limit himself in scope—groceries, rice, textiles, oil. In addition to these benign commodities, Lakhani also traded in weapons, which had become his primary business in recent years. Though arms trading carries sinister connotations, it can be a legitimate business. And indeed, Lakhani had previously engaged in legal

---

[1] 18 U.S.C. § 2339A (count I, attempting to provide material support to terrorists); 22 U.S.C. § 2778 (count II, illegal brokering of controlled munitions); 18 U.S.C. § 1956 (counts III and IV, money laundering); 18 U.S.C. § 542 (count V, attempted importation by means of false statements).

3

arms transactions. In this case, however, he didn't discriminate among customers, illegality notwithstanding.

Muhammad Habib Ur Rehman is a native of Pakistan and a professional informant. He began his informing career by working for the Pakistani government as it combated that country's drug trade. Eventually, Rehman was introduced to the U.S. Drug Enforcement Agency and then served as one of its informants on international drug trading and terrorism. Along the way, Rehman informed on one-too-many people, and his U.S. handlers were forced to extract him and his family from Pakistan. In the United States, where Rehman received asylum, he continued working as an informant for the DEA and, then, the Federal Bureau of Investigation. Rehman estimates that he has received about $400,000 from the Government in his 19 years of informing. For reasons unclear, Rehman was deemed "untrustworthy" in July 2001 and let go from Government service.[2]

Abdul Qayyum is a suspected terrorist now living in Dubai, U.A.E., and is believed to have been involved in a series of 1993 bombings in India known as the "Mumbai blasts." He

---

[2]Lakhani's attorney correctly noted during closing arguments that, in order to convict Lakhani, the jury had to credit Rehman's testimony. By their guilty verdict, they did. And therefore, so do we. *See United States v. Jackson*, 443 F.3d 293, 298–99 (3d Cir. 2006).

4

apparently knew Lakhani from a run-in with one of Lakhani's former officemates. Qayyum met Rehman in the early summer of 2001 through long-time family contacts. At the time, Rehman, who was still working as an informant for the FBI, told Qayyum that "in America I am a powerful person. And if you need any type of assistance or help I am ready to give [it to] you."

Shortly after the September 11th attacks in 2001, Qayyum told Rehman about Lakhani. The subject of Lakhani's arms trading was raised, but Qayyum did not ask Rehman to pursue anything in that regard. Shortly thereafter, though, Lakhani spoke with Rehman. In their initial conversation, Lakhani explained that Qayyum had told him Rehman "was a powerful person in America, [and] if you need any stuff, if you want to do any business[,] you can contact this man." Rehman affirmed Qayyum's statement and offered that if Lakhani "want[ed] to buy something from America . . . [,] I can help you." The two also discussed Lakhani's many businesses, including arms trading.

Rehman communicated with the FBI that same day and was once again put into Government employ in an undercover operation.[3] Rehman held himself out to Lakhani as a

___

[3]The Government recorded hundreds of phone conversations and several face-to-face meetings between Lakhani and Rehman from January 2002 through August 2003. These recordings

representative of the Ogaden Liberation Front. The OLF is an actual, Somalia-based terrorist group that operates in East Africa and the Middle East. If Lakhani did not know this fact already, Rehman made him aware of it in their conversations. Rehman told Lakhani that the OLF needed weapons and asked to use Lakhani's services. Lakhani agreed, and thus began a 22-month odyssey spanning oceans and continents. Rather than recount the tale in tedium, we relate only the significant events and themes that emerge from the record.[4]

In the initial recorded meetings and conversations between Rehman and Lakhani, Rehman said that the OLF was interested in many types of armaments, and Lakhani always responded with assurances such as "They are available," or "I will obtain it."[5] Rehman eventually made known that the "main thing" the OLF needed from Lakhani was shoulder-fired

---

made up much of the evidence against Lakhani and were the subject of significant portions of the trial testimony.

[4]As we reviewed the twelve-volume record in this case, we increasingly agreed with one of the foreign witnesses who remarked at one point, "[M]uch of this has become incomprehensible even more." Nevertheless, we do our best to set out the facts in the light most favorable to the jury verdict, as we must. *Jackson*, 443 F.3d at 298–99.

[5]Incredibly, Lakhani even responded in the same manner to an inquiry about acquiring submarines.

("Stinger") missiles. At the inception of the scheme, Lakhani perhaps thought that Rehman wanted the missiles for use in Africa, but over time it became clear that an attack on civilian airliners in the United States was also one of Rehman's goals. At no time could Lakhani have reasonably thought that the proposed arms deal was legal,[6] and there was never doubt that the missiles were to be shipped into the United States.

Lakhani endorsed the deal enthusiastically, often speaking about it as the beginning of a long-term, arms-trading relationship with Rehman. At first, though, Lakhani thought the requested quantity of missiles too low to be worth his while and pressed Rehman on the issue. The two eventually worked out an agreement whereby Lakhani would first import one missile as a sample, with the expectation that larger orders would follow.

Lakhani's search for a missile supplier apparently began with a company called Ukrspetsexport, a state-owned arms manufacturer in Ukraine with which he previously had done legitimate deals. During the course of the investigation, Lakhani spoke often of his arms-related connections in the Ukraine and

---

[6]Some months into the operation, an Israeli tourist flight in Kenya was fired upon at takeoff with a shoulder-fired missile of similar make to the ones Lakhani sought for the OLF. He congratulated Rehman (even though the attack was unsuccessful), apparently thinking that the OLF was responsible.

7

made about a dozen self-financed trips to the country. Every time Rehman inquired about Lakhani's progress—and it was regularly—Lakhani assured him that the missile would soon be available, often as soon as the next week. It never happened.

To be sure, though, *something* was happening on Lakhani's end of the deal. Several times he faxed information to Rehman detailing the specifications for the IGLA missile system, which is the Russian counterpart to the American Stinger missile. One such fax was sent by Laberia Co., Ltd, and quoted a price of $87,000 per missile. Laberia is based in Cyprus and has offices in Kiev and Moscow. Lakhani was steered to Laberia by Ukrspetsexport because, he said, it is involved in the darker side of international arms trading. Lakhani reported that he saw "the merchandise" on one of his many visits to the Ukraine.

Lakhani eventually began to press Rehman for a down-payment on the missile, but Rehman could not produce it because the FBI had not yet made money arrangements. This caused Lakhani obvious frustration: "If you want to leave it [the deal], I don't mind. . . . Yes, I have spent too much time. How many times I went there." The FBI finally gave Rehman the money, though, and Lakhani told him how to send it along so that it would look "clean" once it got to London. There were two such transfers, each involving an elaborate laundering scheme: Rehman was to give the money to Yehuda Abraham, a jeweler in Manhattan who also owned a money transfer

8

business. Lakhani told Rehman that he would recognize Abraham upon the presentation of a bill with a specific serial number. Abraham then sent the money to accounts held in Hong Kong and Switzerland, which Lakhani's associates could access in London. These machinations, though, apparently did nothing but earn Lakhani two money laundering charges, as the record does not indicate where the money actually went, and in the end Laberia did not provide Lakhani with a missile.

By January 2003, Lakhani's trips to the Ukraine may not have been successful in finding a missile, but they certainly had attracted the attention of the Russian Federal Security Services. One of its informants reported that Lakhani had signed a contract with a representative of Laberia, Sergey Pyatak, for help in locating a missile. Rather than let the arrangement get too far—and, initially, unbeknownst to the FBI—the Russians decided to infiltrate the deal. Russian and American authorities soon began cooperating and designed a mock missile for Lakhani—fully operational electronically, but filled with sand instead of explosives. They then arranged a meeting with Lakhani to complete the sale.

Lakhani, Rehman, and Pyatak all traveled to Moscow in July 2003 to meet with two Russians (undercover law enforcement officials). During the discussions, Lakhani signed a promissory note (in his real name) in the amount of $70,000 for "goods and parts," as well as a contract for "dental medical

equipment" under the name "John Smith."[7]  The group then traveled to the port at St. Petersburg to see the fake missile onto a ship and off to the United States.  In reality, even the box loaded onto the ship was not as it appeared: it did not contain the fake missile.  Instead, a representative of the FBI took it to the United States by plane (a private flight, we trust).

The next time Lakhani saw the missile was at a meeting with Rehman at a hotel in New Jersey overlooking the Newark airport.  The missile was sitting on a sofa in the middle of the room.  Lakhani, in words truer than he knew, remarked, "I can't believe how all of this came about."  Still the eager salesman, he offered to arrange training for up to 50 people on the missile's operation and continued to make arrangements for additional shipments.  As Rehman stood with the missile on his shoulder, pointed out the hotel window toward the airport tarmac, Lakhani

---

[7]Accompanying all international shipments—mainly for tax purposes, but also for security reasons—is a bill of lading that states the contents of the cargo.  After considerable discussion as to how the missile might be slipped past U.S. customs officials and border security, the bill of lading for the missile prepared by Lakhani said simply "dental equipment."  According to the agreement between Lakhani and Rehman, the former would be in charge of shipping the missile to the United States, and the latter would make arrangements to clear it through customs.  Lakhani did suggest, though, that Rehman use a particular importer and advised that customs officials would need to be bribed.

remarked, "[I]f we strike fifty at one time, simultaneously, it will f--- their mother. . . . It will shake them. Then they will run. . . . Strike simultaneously at . . . whatever time you decide. All at once in different cities at the same time. . . . They will think the war has started." Lakhani was arrested that day.

## II. Discussion

Lakhani raises four arguments on appeal. First, he asserts that no reasonable juror could have concluded that he was not entrapped. Relatedly, Lakhani argues that the Government's involvement in the crime was so outrageous as to violate the Due Process Clause of the Fifth Amendment to the Constitution. Third, he asserts that the District Court erred by not investigating alleged juror misconduct. Finally, Lakhani contests the reasonableness of his 47-year prison sentence.

### A. Entrapment and Due Process

Entrapment and its related due process defense are based on the notion that it "serves no justifying social objective" for the Government to "creat[e] new crime for the sake of bringing charges against a person [it] had persuaded to participate in wrongdoing." *United States v. West*, 511 F.2d 1083, 1085 (3d Cir. 1975).[8] Despite their common intellectual origin, however,

---

[8] *See also United States v. Archer*, 486 F.2d 670, 677 (2d Cir. 1973) (Friendly, J.) ("Prosecutors and their agents naturally tend

the two defenses are not identical and require distinct inquiries to apply properly. On the one hand, the defense of due process focuses exclusively the conduct of the Government. If that conduct is "so outrageous" as to be "shocking to the universal sense of justice," then the Due Process Clause can function as an "absolut[e] bar [on] the [G]overnment from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973). The defense of entrapment, on the other hand, focuses on the defendant himself: if the defendant was predisposed to commit the crime, then it cannot be said that the Government is responsible, notwithstanding the egregiousness of its conduct. *Id*. at 432–36.[9]

---

to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.").

[9]The concept of "entrapment" is not of ancient pedigree. *See* Jonathan C. Carlson, *The Act Requirement and the Foundations of the Entrapment Defense*, 73 VA. L. REV. 1011, 1013 (1987) (referring to the entrapment defense as "remain[ing] at a formative stage"). The Supreme Court first recognized entrapment as a valid defense in *Sorrells v. United States*. 287 U.S. 435 (1932). In *Sorrells*, however, there was sharp disagreement among the Justices on its proper legal basis.

Some, led by Justice Owen Roberts, argued that the defense of entrapment should be grounded in the inherent power of a court to "protect[] . . . its own functions" and "preserv[e]

12

. . . the purity of its own temple." *Id.* at 457. This approach focused the inquiry on governmental action and considered whether it was sufficiently "revolting." *Id.* at 454. Another approach—adopted by the *Sorrells* majority—framed the question as one of statutory interpretation. This approach was based on the conclusion that Congress would not have enacted a statute whereby "its process of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them." *Id.* at 448. Framed in this way, the focus of the inquiry became the defendant himself—specifically, his predisposition. If a defendant is predisposed to commit the crime charged, then the defense of entrapment is not available to him—no matter what the Government's actions may have been.

It was not until two 1970s cases, *Russell* (cited in the text) and *Hampton v. United States*, 425 U.S. 484 (1976), that the law was settled as described above (*i.e.*, two distinct defenses of entrapment and due process). The Court in *Russell*, by a 5-to-4 vote, reaffirmed that the defendant-focused approach to the entrapment defense was the proper one. 411 U.S. at 432–36. However, in the course of its discussion, the Court offered the following caveat: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that *due process principles* would absolutely bar the [G]overnment from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." *Id.* at 431–32 (emphasis added, citation omitted).

13

Lakhani raises both defenses on appeal, but neither are compelled by the facts of this case.

*1. Entrapment*

---

This statement indicated a possibility that if the Government's actions were sufficiently outrageous, then due process would step in where entrapment could not. That possibility was confirmed in *Hampton*. Justice Powell, writing for himself and Justice Blackmun (providing two necessary votes for the Court's judgment), explained that he did not believe the law to preclude the notion that "fundamental fairness inherent in the guarantee of due process [might] prevent the conviction of a predisposed defendant." *Hampton*, 425 U.S. at 492 (Powell, J., concurring). Rather, he believed that the defense of "[e]ntrapment should now be employed as a term of art limited to [predisposition]," *id.* at 492 n.2, and that either a court's supervisory power or due process "could support a bar to conviction" where the defendant was predisposed, but the Government's actions were nevertheless "outrageous" and violated fundamental fairness, *see id.* at 492–95 & n.6 (Powell, J., concurring).

It is Justice Powell's conception of the doctrine and terms that our Court has employed since *Hampton*: "entrapment" focuses on the predisposition of the defendant to commit the crime, whereas "due process" focuses on the Government's conduct. *See United States v. Nolan-Cooper*, 155 F.3d 221 (3d Cir. 1998); *United States v. Beverly*, 723 F.2d 11 (3d Cir. 1983); *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (*en banc*); *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978).

14

As noted above, "[t]he element of non-predisposition to commit the offense is the primary focus of an entrapment defense." *United States v. Fedroff*, 874 F.2d 178, 182 (3d Cir. 1989); *see United States v. Gambino*, 788 F.2d 938, 944 (3d Cir. 1986); *Jannotti*, 673 F.3d at 597. It is a "'relatively limited defense' that may defeat a prosecution only 'when the Government's deception actually implants the criminal design in the mind of the defendant.'" *Fedroff*, 874 F.2d at 181 (quoting *Russell*, 411 U.S. at 435–36). Once properly raised by the defendant,[10] "the [G]overnment has the burden to disprove the whole (entrapment) defense beyond a reasonable doubt." *Jannotti*, 673 F.2d at 597 (internal quotation marks omitted). In *Gambino*, we agreed with the Second Circuit Court of Appeals in noting three ways in which the Government may do so: "'(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.'" 788 F.2d at 945 (quoting *United States v. Viviano*, 437 F.2d 295, 299 (2d Cir. 1971)). We have also

---

[10]To do so, a defendant must produce sufficient evidence of inducement on the part of the Government and a lack of predisposition on his own part. *See Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Wright*, 921 F.2d 42, 44 (3d Cir. 1990). The Government does not contest that Lakhani met these requirements.

15

suggested several (somewhat overlapping) factors for consideration when making a determination on predisposition:

> "the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government."

*Fedroff*, 874 F.2d at 184 (quoting *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 (9th Cir. 1977)). Simple solicitation by the Government is not inducement. *United States v. Marino*, 868 F.2d 549, 551–52 (3d Cir. 1989).

"[A]lthough there may be instances where the undisputed facts establish the entrapment defense as a matter of law . . . , [it] is generally a jury question." *Jannotti*, 673 F.2d at 597 (citations omitted). When a jury has rejected the entrapment defense, we "must view the evidence in the light most favorable to the prosecution, and resolve all reasonable inferences therefrom in its favor. . . . Viewing the evidence in this light, [we] must uphold the jury's verdict unless no reasonable jury could conclude beyond a reasonable doubt that the defendant

16

was predisposed to commit the offense for which he was convicted." *Id.* at 598 (citations omitted).

Given this, we can easily conclude that the jury's rejection of Lakhani's entrapment defense is supported by the evidence presented at trial. The Government's evidence fits mostly into the third method of showing Lakhani's predisposition: "a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." *Gambino*, 788 F.2d at 945.[11] The record is replete with examples of Lakhani's eagerness to obtain a missile for Rehman and the OLF. Even though the Government initiated this illegal arms deal, Lakhani's "ready response" to its

---

[11]The Government also argues that it proved Lakhani's predisposition by showing a prior course of similar criminal conduct. *See Gambino*, 788 F.2d at 945. It would be more difficult to affirm Lakhani's conviction on that ground alone. True, the Government introduced evidence showing Lakhani's knowledge of, and connection with, various arms companies. There was scant evidence, however, that any of Lakhani's activities with those companies was illegal, as it must be in order to prove predisposition under that prong. *See id.* (speaking of a prior "course of criminal conduct"). In fact, the only consummated transaction mentioned at trial was a legal one between Ukrspetsexport and the government of Angola. In his testimony, Rehman briefly mentioned that Lakhani indicated that some of his prior arms dealings were under the table, but this evidence was not developed to any significant degree.

solicitation is amply demonstrated by his multiple, self-financed trips to the Ukraine in search of a missile. This alone would be enough for the jury to reject Lakhani's entrapment defense and for us to affirm his conviction.

But there is more. Repeatedly over the course of the investigation—including at their very first meeting—Lakhani eagerly told Rehman that the missile "is available. . . . You will get it. I will obtain it." Not only that, but Lakhani pushed Rehman to order *more* missiles in order to earn a higher profit: "[T]he quantity seems to be very small. . . . If I have to take this risk, better if a good quantity comes out." This enthusiasm continued until the day Lakhani was arrested, when the missile had finally arrived on the hotel couch and he sought to arrange the next shipment. Moreover, other than the missile's actual transportation and border crossing, Lakhani accomplished many technical aspects of the deal himself, without the suggestion or aid of the Government. This included, not insignificantly, the entire money laundering scheme and fraudulent bill of lading.

No piece of evidence indicates a reluctance on Lakhani's part to complete the illegal arms deal; indeed, everything demonstrates the opposite. Therefore, a reasonable jury could have concluded that the Government proved Lakhani's predisposition (*i.e.*, he showed a "willingness to commit the crime" by showing his "ready response to the inducement"). We will not disturb the jury's determination that Lakhani was not entrapped by the Government.

18

## 2. Due Process

"[T]he judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." *United States v. Voigt*, 89 F.3d 1050, 1065 (3d Cir. 1996). We have said that this principle is to be invoked only in the face of "the most intolerable government conduct," *Jannotti*, 673 F.2d at 608—not "'each time the government acts deceptively or participates in a crime that it is investigating,'" *Nolan-Cooper*, 155 F.3d at 231 (quoting *United States v. Mosely*, 965 F.2d 906, 910 (10th Cir. 1992)). Moreover, due process should not be used in this context "'merely as a device to circumvent the predisposition test [of] the entrapment defense.'" *Id.* (quoting *Mosely*, 965 F.2d at 910); *see Jannotti*, 673 F.2d at 608 ("We must be careful not to undermine the [Supreme] Court's consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense."). In this spirit, we have been "admonished" not to "exercise 'a "Chancellor's foot"' veto over law enforcement practices of which [we might] not approve." *Beverly*, 723 F.2d at 12–13 (quoting *Russell*, 411 U.S. at 435).

Precedent in the three decades since *Hampton* indicates that courts have heeded these admonitions. As the First Circuit Court of Appeals has noted, "[t]he banner of outrageous misconduct is often raised but seldom saluted." *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993) ("[C]ourts have rejected its application with almost monotonous regularity."). The

19

defense has been called "moribund," *id.*, and "hanging by a thread," *Nolan-Cooper*, 155 F.3d at 230. Indeed, our Court is alone in having recognized a violation of due process as set out by Justice Powell in *Hampton*. *See Nolan-Cooper*, 155 F.3d at 224, 230 (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978)).

Still, the defense is available in this Circuit, *see Voigt*, 89 F.3d at 1064, as it theoretically is in at least seven others, *see United States v. Mosley*, 965 F.2d 906, 909 (10th Cir. 1992) (collecting cases). The only relevant question for us, therefore, is whether this is a proper case for its application. For the defense to apply, the Government's conduct must have rendered the prosecution of the defendant fundamentally unfair. *See Hampton*, 425 U.S. at 494 n.6 (Powell, J., concurring). As we have quoted before,

> "[a]lthough the requirement of outrageousness has been stated in several ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable . . . . The cases make it clear that this is an extraordinary defense reserved for only for the most egregious circumstances."

*Nolan-Cooper*, 155 F.3d at 230–31 (alteration in original) (quoting *Mosely*, 965 F.2d at 910). We have noted that "courts have experienced considerable difficulty in translating

20

'outrageous misconduct' into a defined set of behavioral norms." *Id.* at 230. This does not relieve us of the obligation to enforce the bounds of constitutional acceptability, however. As noted by Justice Powell in his *Hampton* concurrence, "[t]he fact that there is sometimes no sharply defined standard against which to make these judgments is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances." 425 U.S. at 494 n.6. This we undertake to do.[12] Because outrageous government conduct, a constitutional claim, is a mixed question of law and fact, "[w]e exercise plenary review over the district court's legal conclusions, and review any challenges to the court's factual findings for clear error." *Nolan-Cooper*, 155 F.3d at 229; *see Voigt*, 89 F.3d at 1064.

At Lakhani's sentencing hearing, the District Court first

---

[12]The Government argues, citing *United States v. Pitt*, 193 F.3d 751 (3d Cir. 1999), that because Lakhani did not move on this ground for dismissal of the superseding indictment before the trial, he has waived whatever defense may be available to him in this regard. We note that in *Pitt*, unlike here, the due process argument was raised for the first time on appeal. *See id.* at 759. Not only that, but here the District Court explicitly ruled that "the . . . argument was not waived" because it would have waited until after the trial to rule on the motion. In any event, because we ultimately reject Lakhani's due process argument, we need not decide how we would deal with his purported waiver here. *See id.* at 761–62.

ruled on his motion to dismiss the superseding indictment:

> I am denying the motion and let me tell you why. Addressing the argument on the merits, it fails. The evidence does not establish the extent of outrageous government conduct that would be necessary to prevail. None of the conduct of the government agents was demonstrably outrageous or intolerable or even close to meeting the rigorous standards enunciated in *United States v. Nolan*[-]*Cooper*, 155 F.3d 221, at pages 230, 231. Which rigor[ous] standard is, "shocking outrageous, and clearly intolerable." Leaving aside the extremely high hurdle facing a defendant making the motion, this defendant's efforts are defeated by evidence such as the fact that he initiated the contact with the government informant on the advice of terrorists; he promoted himself during the very first contact with the informant as someone in the weapons business whose source and supply was Ukraine and had information[] and details about all types of weapons; on his own he made innumerable phone calls and made numerous trips pursuing the deal with the informant; he was part of the world of arms trading before he contacted the informant; his efforts in the Ukraine, which amounted to unlawful brokering[,] were sufficient to pique the

22

interests of Russian authorities who initiated contact with the FBI in response. The shock in this case has only one source: Mr. Lakhani's own words and deeds as exposed on video tapes played to the jury.

It is difficult to discern error (let alone clear error) in any of the District Court's factual findings or legal error in its due process ruling.

Lakhani argues that the facts of this case are analogous to, if not "more compelling" than, those in *Twigg*—the only case in which the Government's conduct has offended due process. *Twigg* involved an undercover investigation of two individuals by the DEA, Henry Neville and William Twigg. In that case, Robert Kubica, a pled-out defendant currying favor with prosecutors, "agreed to aid the [DEA] in apprehending illegal drug traffickers" and spoke with Neville to propose setting up a methamphetamine lab. *Twigg*, 588 F.2d at 375. Neville expressed an interest, and over several months the arrangements were made. Twigg became involved at the behest of Neville, to whom he owed money. Neville "assumed primary responsibility for raising capital and arranging for distribution" of the drugs, "while Kubica [the Government agent] undertook the acquisition of the necessary equipment, raw materials, and a production site." *Id.* The Government assisted Kubica greatly with his end of the bargain. "Kubica was completely in charge of the entire laboratory," and "[a]ny production assistance

23

provided by Neville and Twigg was minor and at the specific direction of Kubica." *Id.* at 376. Once the lab was established, it operated for one week and produced six pounds of methamphetamine, after which Twigg and Neville were arrested.

Lakhani argues many similarities between his case and *Twigg*. With only one such similarity do we agree: the evidence indicates that, as in *Twigg*, it was the Government agent, Rehman, who first suggested the criminal activity. Beyond that, however, significant dissimilarities abound. Rather than the Government agent being "completely in charge" and "furnish[ing] all of the [relevant] experience," as in *Twigg*, here it was Lakhani who used his *own* knowledge of the arms business for the benefit of the illegal scheme. Lakhani traveled to Russia and the Ukraine on his own tab, communicated with no fewer than three separate arms companies, created fraudulent shipping documents, and deployed his own money laundering network. In addition, unlike in *Twigg*, where we saw little predisposition on the part of the defendants, there is much to suggest otherwise in Lakhani's case, as explained above. *See supra* Part II.A.1.

The fact that the Government, as here, is on all sides of a transaction—both buyer and seller—does not a due process violation make. *See Jannotti*, 673 F.2d at 608. Even in *Twigg* we recognized that where the Government is investigating "fleeting and elusive crime[s]," it may "require more extreme

24

methods of investigating, including the supply of ingredients." 588 F.2d at 378. Likewise, we suggested in *Jannotti* that Government investigations of crimes that were "difficult to uncover" because "both parties to the transaction have an interest in concealment" would be given greater latitude. 673 F.2d at 609. We have here a Government investigation of international terrorism. With this context, we have no difficulty holding that the Government's conduct does not rise to the level of a due process violation.

## B. Juror Misconduct

Though we have ruled both that a reasonable jury could have found that Lakhani was not entrapped and that the Government's conduct does not constitute a violation of the Fifth Amendment, the jury would have been free to conclude otherwise and return a "not guilty" verdict. Blackstone considered trial by jury to be "the most transcendent privilege which any subject can enjoy[] or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals." 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 379 (1769). As the Supreme Court has noted, the jury is the "circuitbreaker in the State's machinery of justice." *Blakely v. Washington*, 542 U.S. 296, 306 (2004).

It appears that Lakhani's entrapment defense gave pause to at least one juror. How the guilty verdict eventually was

25

reached is Lakhani's third point on appeal.

Several months after the jury rendered its verdict, in July 2005, Lakhani's prosecution was the subject of an hour-long report on *This American Life*, a weekly radio program produced at WBEZ in Chicago and broadcast nationally on National Public Radio stations.[13]  In the course of the report, a woman identified as juror number nine from Lakhani's trial gave her views on his prosecution: "As far as I'm concerned, it was entrapment if he didn't actually do anything."  The reporter indicated that the other jurors believed Lakhani could have acquired a missile if he had tried long enough.  But juror number nine retorted:

> But did he try for 22 months and didn't get one?
> And after offering all this millions of dollars?
> And he couldn't get a missile?  No, he . . . wasn't
> gonna never get no missile.  And they knew he
> wasn't gonna get one either.  That's why they
> bought it and set it right there in his lap.

Such strongly held views might have been expected to produce a hung jury, if not an eventual acquittal.  On the radio report, juror number nine recounted the jury deliberations:

---

[13]A free, streaming-audio recording of the program is available at www.thislife.org.

> From day one, I can't understand it. They [the other jurors] came in and they sat down and they says this man is guilty, guilty, guilty, guilty, guilty, guilty. They didn't even think about it. Hey wait a minute, let's analyze these things. Let's go over 'em one by one.

Juror number nine held her ground for several hours. Another juror, identified in the report as juror number six, described the scene:

> So I says he's guilty. Someone says he's not guilty. And I'd say but he's guilty because look at page 48. And then someone else will say, well look at page 52. So everyone [was] trying to make themselves heard. Voices started . . . to rise so you could be . . . heard over the crowd. The juror who felt that he was not guilty, I think, felt overwhelmed by probably a good 6, 7, 8 jurors talking loudly at the same time, that actually turned into screaming to be heard. It was probably very intimidating for her. . . . 'Cause she [juror number nine] was the only one that thought that he was not guilty.

Juror number nine, though, eventually voted to return a guilty verdict. She explained:

Now this is how that happened. I just closed on a house in Virginia, and everybody [in the] juror room knew it 'cause the court was closed down on April 25th so I could go close on the house. So when we came back, I think we started deliberating on a Wednesday, and when we got to [t]hat count and I said the man [is] not guilty, and there ain't nobody gonna change my mind. And the jury foreman said [that] if I didn't go along with them, I wouldn't see the inside of my house until December. So, I said aw, what the hell. He don't mean nuthin' to me. The man guilty. But I know it was wrong. It wasn't right to do that man like that. It wasn't right. But it's over now.

When asked whether she regretted her decision, juror number nine answered, "I don't know. Yeah, yeah, I really do. Because as far as I'm concerned the man was entrapped. I shoulda held out."

On the basis of this report, Lakhani moved for further investigation of the jury deliberations and for a new trial. The District Court denied the motion—a decision we review for abuse of discretion. *United States v. Richards*, 241 F.3d 335, 343–44 (3d Cir. 2001). We hold not only that the District Court's decision was not an abuse of discretion, but also that a contrary decision would have been error.

28

The above-quoted juror statements are not competent evidence to impeach the jury verdict. Rule 606(b) of the Federal Rules of Evidence provides that,

> [u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The origin of this rule is attributed to the 1785 decision of Lord Mansfield in *Vaise v. Delaval*. 99 Eng. Rep. 944 (K.B. 1785). Our slightly more recent decision in *Gov't of the V.I. v. Gereau*, 523 F.2d 140 (3d Cir. 1975), identified five policies that the rule fosters: "(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and

open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; [and] (5) maintaining the viability of the jury as a judicial decision-making body." *Id.* at 148 (citing *McDonald v. Pless*, 238 U.S. 264 (1915)). Therefore, "evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict." *Id.* at 150 (footnotes omitted). At the same time, we also identified several circumstances that would fall under the rule's exception for "extraneous prejudicial information," including "(1) exposure of [the] jury to news items about the matter pending before the jury; (2) consideration by the jury of extra-record facts about the case; (3) communications between third parties and jurors [that are] relevant to the case [under consideration]; [and] (4) pressures or partiality on the part of the court." *Id.* (citation, internal quotation marks, and footnotes omitted).

The alleged facts of these jury deliberations are so clearly within the rule and outside the exception as to make it difficult to give an explanation beyond stating the rule itself: "we do not permit jurors to impeach their own verdicts." *United States v. Lloyd*, 269 F.3d 228, 237 (3d Cir. 2001). Though we hope that jury deliberations proceed in a manner respectful of every juror's opinion, rather than what allegedly occurred here,"[t]estimony concerning intimidation or harassment of one juror by another falls squarely within the core prohibition of the Rule." *See United States v. Stansfield*, 101 F.3d 909, 914 (3d

30

Cir. 1996) (internal quotation marks omitted). In fact, one major purpose of the rule is to prevent a juror from being able to recant her vote—exactly the situation presented in this case. Not only did juror number nine accede to a guilty verdict in the jury room, she again expressed her agreement in open court when the District Court polled each juror individually. Had she felt improperly pressured by the other jurors, juror number nine should have raised the issue with the Judge at that point, if not earlier. Allowing subsequent misgivings to call a verdict into question would erode the solemnity of a juror's function in the first instance.

If intra-jury comments "carried the coercive force of threats or bribery," only then "would we be justified in treating them, factually, as 'extraneous influences.'" *Gereau*, 523 F.2d at 152. Here, the jury foreman's "threat" to keep juror number nine from her new home for months is obvious hyperbole. If the jury system is to function properly, not only must we rely on every juror to be open to genuine persuasion, but just as importantly, jurors must also hold steadfast to their firmly held beliefs. Though explaining a vote with the phrase "He didn't mean nuthin' to me" is hardly heartening, human frailty sometimes happens. Where that frailty becomes reversible error is set out in Rule 606(b), and we are not presented such a case here.

## C. Sentencing

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), district courts have broad discretion in selecting a specific sentence, *see United States v. Cooper*, 437 F.3d 324, 330 n.9 (3d Cir. 2006). Our review is for reasonableness in light of the factors set forth in 18 U.S.C. § 3553(a). *Booker*, 543 U.S. at 260–65; *Cooper*, 437 F.3d at 330–31. The standard is "deferential" because "the trial court [is] in the best position to determine the appropriate sentence in light of the particular circumstances of the case." *Cooper*, 437 F.3d at 330. To facilitate adequate review, "the record must show a true, considered exercise of discretion on the part of a district court . . . ." *United States v. Jackson*, 467 F.3d 834, 841 (3d Cir. 2006); *see also United States v. Grier*, 475 F.3d 556, 571–72 (3d Cir. 2007) (*en banc*).

Here, the statutory maximum for the crimes of conviction was 67 years in prison. *See* 18 U.S.C. § 2339A (count I, 15 years); 22 U.S.C. § 2778 (count II, 10 years); 18 U.S.C. § 1956 (counts III and IV, 20 years each); 18 U.S.C. § 542 (count V, 2 years). The District Court first calculated the advisory Sentencing Guidelines range, which yielded a recommended life sentence. Lakhani does not dispute the Guidelines calculation. There being no motions for departure, the District Court then proceeded to impose a sentence pursuant to 18 U.S.C. § 3553(a). The Judge explained:

32

Based on Section 3553 factors that require that I consider the nature and circumstances of the offense, I believe it would be a dereliction of my duty to the public to impose anything other than the statutory maximum for the reprehensible conduct for which the jury convicted Mr. Lakhani. The history and circumstances of this defendant, while he indicated [a] crime-free life, illustrates well a single-minded greed and determination to profit in the illegal arms trade that countervail consideration of the first offender status.

The statute requires that the sentence be sufficient but not greater than necessary to promote the purposes of sentencing. And as indicated, I do not believe that the harsh sentence that the statutory maximum call[s] for under these circumstances would be greater than necessary to promote these purposes.

And looking at those purposes, the statutory maximum [of the] counts of conviction accomplishes those purposes, which are to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. I think everything I said supports those purposes. The next purpose (B), to afford adequate deterrence to

33

criminal conduct, without a question is supported by a sentence of a statutory maximum. The next purpose, the need to protect the public from further crimes by this defendant is arguably less relevant given his age and given his health,[14] but I repeat his age and the state of his health do not offer mitigation.

His crimes are such that the other purposes, including the final factor (D) to provide the needed, in this case medical care, or other correctional treatment [in the] most effective manner[,] combine[] to support imposing the maximum punishment under the statutes.

The Judge then sentenced Lakhani to the statutory maximum on each count, the sentences to be served consecutively (with the exception of the two money laundering counts, which are to be served concurrently). This yielded a total term of imprisonment of 47 years.

We cannot say that this sentence is unreasonable. Though Lakhani admits to the seriousness of his offenses, he

---

[14]At the time of sentencing, Lakhani was 70 years old and suffered from multiple ailments, including coronary disease. His prognosis is "poor." During the course of Lakhani's trial, proceedings were delayed at least twice for his hospitalization.

34

continues to assert entrapment as a mitigating factor. We do not deny that the District Court at sentencing would have been entitled to consider the Government's pervasive role in this case—even if not amounting to a due process violation or entrapment *per se*. But in the end, the Court (like the jury) was not persuaded by Lakhani's defense. Our deferential review puts us in no position to second guess that conclusion.

Lakhani also argues that the District Court's general deterrence justifications are inapt. He states that "no sentence would be long enough" to deter a true terrorist and that the only thing his sentence may have accomplished is the deterrence of "charlatans and con-artists from suggesting they can provide weapons to terrorists." That may be so, but accepting Lakhani's argument would require criminal courts to abandon their sworn duty in the face of an irrational enemy. Section 3553(a) requires no such thing. Moreover, even if potential terrorists are unlikely to be undeterrable, their necessary aiders and abetters—such as Lakhani believed he was—may be. Moreover, aside from general deterrence, the penological goal of specific deterrence provides ample reason for Lakhani's sentence: he will never again seek to provide material support to terrorists. Despite the role the Government played in his crime, we have no doubt that if Lakhani had actually stumbled into a willing provider of a real missile, he would eagerly have arranged to smuggle it into the

United States all the same.[15]

Therefore, we conclude, in light of the factors set forth in 18 U.S.C. § 3553(a), that a sentence of 47 years—20 years less than what was available to the District Court—is reasonable in this case.

\* \* \* \* \*

For the foregoing reasons, we affirm both Lakhani's conviction and his sentence.

---

[15]As to Lakhani's argument for mitigation based on his age and health, we note that the District Court was reasonable to conclude that those factors did not entitle him to leniency. Nothing about Lakhani's age or health hindered his criminal pursuits in this case, and it is not unreasonable to think that the same would hold in the future.