**UNITED STATES of America**

v.

**Phillip MONTGOMERY, Appellant.**

**No. 08–1077.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
LAR 34.1(a) June 23, 2009.

Opinion Filed: July 15, 2009.

George S. Leone, Esq., Office of United States Attorney, Newark, NJ, Glenn J. Moramarco, Esq., Office of United States Attorney, Camden, NJ, for United States of America.

---

Joshua L. Markowitz, Esq., Michael J. O'Donnell, Esq., Markowitz Gravelle, Lawrenceville, NJ, for Appellant.

Before: BARRY, SMITH, Circuit Judges, and RESTANI,* Judge.

## OPINION

BARRY, Circuit Judge.

Appellant Phillip Montgomery, a former police officer, was convicted by a jury of deprivation of civil rights, conspiracy to obstruct justice, and one substantive count of obstruction of justice. The District Court sentenced Montgomery to 24 months' imprisonment.[1] We are not persuaded by Montgomery's arguments for reversal, and will affirm.[2]

### I. Factual Background

Because we write solely for the parties, we presume familiarity with the facts and will recite only the basic underpinnings of this case.

Phillip Montgomery formerly worked as a police officer in Asbury Park, New Jersey. In February 2003, while unsuccessfully attempting to execute an arrest warrant for Jonathan Thomas, a local drug dealer, Montgomery stole Thomas's expensive, diamond-studded watch. That same day, Montgomery gave the watch to Victor Ashkenazi, a close friend and local jeweler, for safekeeping.

Within the next couple of days, several people, including Thomas's mother, came into Ashkenazi's jewelry store to ask where the watch had come from. Ashkenazi contacted Montgomery, who told him that "nobody can know the watch came from [Montgomery]" and that he should tell anyone who asked that the watch was brought in by "some chick." (SA 262.) Later, Montgomery had Ashkenazi purchase a duplicate watch so that he could cover his tracks. As he explained to Ashkenazi: "in case anybody wants to know, I have the watch, what do I need another one for?" (*Id.* at 263.)

For several years, the stolen watch remained in the back room of Ashkenazi's jewelry store. In the summer of 2006, however, the FBI was looking into police corruption in Asbury Park, and suspected Montgomery of involvement in illegal narcotics. As part of its investigation, the FBI obtained authority to wiretap Montgomery's cellular telephone, and, having heard rumors of the watch theft, served a subpoena on Ashkenazi that asked for information about his dealings with Asbury Park police officers.

Although Ashkenazi initially contacted Montgomery to inform him of the subpoena, he soon began cooperating with the FBI. During the course of this cooperation, Ashkenazi, with the encouragement of law enforcement, attempted to get Montgomery to incriminate himself by discussing the stolen watch over the wiretapped phone. Apparently concerned, Montgomery sent Efrin Rivera, a friend and later codefendant, into Ashkenazi's jewelry store to retrieve the watch. Rivera handed Ashkenazi a note demanding the watch, but Ashkenazi refused to hand it over.[3] Later that same evening, after Ashkenazi

---

* Honorable Jane A. Restani, Chief Judge, U.S. Court of International Trade, sitting by designation.

1. Montgomery does not challenge his sentence on appeal.

2. The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

3. At that point, unbeknownst to Montgomery and Rivera, the watch was in the possession of the FBI.

left work, Montgomery and Rivera followed him to a local supermarket. Once inside, Montgomery confronted Ashkenazi, and as Ashkenazi exited the supermarket and walked to his car, Montgomery and Rivera stared him down in an allegedly intimidating manner.

At trial, Montgomery testified that he had inadvertently taken the watch, only to realize later what he had done, and panicked. He denied any intent to intimidate Ashkenazi, or to interfere with the federal investigation. Unswayed, the jury convicted Montgomery on all counts.

## II. Analysis

### A. Entrapment Defense

Montgomery first argues that the District Court improperly prevented him from raising an entrapment defense. This argument is bolstered by the fact that the jury, *sua sponte*, sent a question to the Court asking: "Should we be considering entrapment with regard to the defendants and if so, can you provide us with an interpretation of the law regarding entrapment?" (SA 1395.) The Court instructed the jury that entrapment had not been raised.[4]

The parties hotly dispute whether Montgomery ever tried to raise an entrapment defense at trial, or whether he is manufacturing a new issue on appeal. There is conflicting evidence on this question, and we decline to wade into what is a sticky dispute.[5] Even assuming entrapment was

raised, the District Court acted properly in not allowing it to be presented to the jury because the facts of this case simply do not support an entrapment defense.

Entrapment is "based on the notion that it serves no justifying social objective for the Government to create new crime for the sake of bringing charges against a person it had persuaded to participate in wrongdoing." *United States v. Lakhani*, 480 F.3d 171, 177 (3d Cir.2007) (citations, quotations, and alterations omitted). An entrapment defense "focuses on the defendant himself: if the defendant was predisposed to commit the crime, then it cannot be said that the Government is responsible." *Id.* at 178. Thus, "[t]he element of non-predisposition to commit the offense is the primary focus of an entrapment defense." *United States v. Fedroff*, 874 F.2d 178, 182 (3d Cir.1989). Before an entrapment defense and concomitant instruction are permissible, "the defendant must produce evidence of both non-predisposition and inducement [by the Government]." *Id.*

Montgomery presented no such evidence. To the contrary, the evidence showed that, from the beginning, Montgomery was predisposed to commit the obstruction of justice crimes: he asked Ashkenazi to hide the true source of the watch; he obtained a duplicate watch to confuse investigators; he sent Rivera to get the watch; and he followed and intimi-

---

**4.** The Court stated in full:

The defense of entrapment is not raised in this case and, therefore, I'm not providing an interpretation. That is not part of the case. However, the burden is always on the prosecution to prove guilt beyond a reasonable doubt. The burden never shifts to a defendant, the law never imposes upon the defendant in a criminal case the burden or duty of calling any witnesses, or producing any evidence. The government must prove each and every element as I have

instructed to you, beyond a reasonable doubt, in order to obtain a conviction. That is my instruction to you on the third question.

(SA 1395.)

**5.** The government properly concedes that it wrongly argued at trial that the entrapment defense was waived as it was not brought as an affirmative pretrial defense. (*See* Appellee's Br. 23–24.)

dated Ashkenazi, a material witness. Additionally, Montgomery admitted to the FBI in a proffer session what he intended to do with the watch if he had been able to obtain it: "I would have thrown it in the ocean." (SA 741.)

Montgomery argues that the FBI scripted Ashkenazi's phone conversations, and that he initially told Ashkenazi to give the watch to the FBI. But these facts do not support an entrapment defense. Even assuming that the evidence supports a finding that the FBI scripted Ashkenazi's conversations, such scripting sheds no light on Montgomery's predisposition (or lack thereof). Additionally, that Montgomery once told Ashkenazi to give the watch to the FBI is not indicative of a lack of predisposition: to the contrary, it is entirely consistent with his original ruse, i.e., that the watch came from "some chick."[6] (SA 262.)

The FBI did not induce Montgomery to commit additional crimes, but rather investigated a crime already committed. The FBI obtained the cooperation of a witness, and encouraged the witness to trick Montgomery into admitting involvement with the watch theft. The fact that Montgomery, in reaction to the federal investigation, undertook to obstruct justice cannot be laid at the feet of the government.

"Entrapment is a 'relatively limited defense' that may defeat a prosecution only 'when the Government's deception actually implants the criminal design in the mind of the defendant.'" Fedroff, 874 F.2d at 181 (quoting United States v. Russell, 411 U.S. 423, 436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)). The facts of this case do not support an entrapment defense, and it was not error for the District Court to prevent Montgomery from arguing the issue.[7]

### B.  Exclusion of Expert Psychological Evidence

Montgomery also asserts that the District Court erred in excluding a report on his mental health that the defense purportedly sought to use to negate the mens rea elements of the crimes. The report concluded that Montgomery had post-traumatic stress disorder, probably had an unspecified personality disorder, and was "likely not capable of organized clear thought" at the time of the obstruction of justice. (See App. 174–91.)

The parties agree that this issue is governed by United States v. Pohlot, 827 F.2d 889 (3d Cir.1987). In Pohlot, we held that "evidence of mental abnormality" should be admitted "only when, if believed, it would support a legally acceptable theory of lack of mens rea," i.e., that the mental abnormality would negate the specific in-

---

6.  Montgomery's defense was not that he lacked the predisposition to commit the obstruction offenses, but rather that he did *not* commit the offenses at all—i.e., that he lacked, as a factual matter, the intent to obstruct. Montgomery's contention was that he innocently told Ashkenazi to give back the watch, and that his confrontation with Ashkenazi was not intended to obstruct. The jury rejected this version of events, and the lack of an entrapment instruction did not impede Montgomery's presentation of his case.

7.  Montgomery also argues that the District Court erred in not giving the jury an instruc-

tion on so-called governmental overreaching. There was no error here: the facts do not support the issuance of such an instruction, and, in any event, this issue is for a judge, not a jury. See United States v. Pitt, 193 F.3d 751, 760 (3d Cir.1999) (defining governmental overreaching defense as when a "defendant's due process rights have been violated because the government created the crime for the sole purpose of obtaining a conviction," and noting that it is "well-established that the issue of outrageous government conduct is for the court, and not the jury, to resolve").

tent for the commission of a crime. *Id.* at 905–06. Although the report in question is littered with sweeping legal conclusions about Montgomery's mens rea (*see* App. 17 ("The *mens rea* for a purposeful act to obstruct justice is highly questionable under these circumstances unless a specific warning was given, then it would still be questionable to a lesser degree.")), the substance of the report does not negate the mens rea for any of the crimes.

The report concludes that Montgomery may have stolen the watch to send a message to Jonathan Thomas, the drug dealer. While interesting, this conclusion does not negate the willfulness of the theft, but rather merely posits a different motive. Additionally, Montgomery's post-traumatic stress disorder, which the report argues foreclosed his ability to engage in "organized clear thought" (*id.* at 191), does not negate the intent to knowingly obstruct justice. (*See* SA 1210 (jury instruction on mens rea for obstruction) ("An act is done knowingly if it's done voluntarily and purposely and not by accident or mistake. An act is done willfully if done voluntarily and intentionally, with specific intent to do something the law forbids, that is with bad purpose, to disobey or disregard the law.")) As we said in *Pohlot,*

> Criminal responsibility must be judged at the level of the conscious. If a person thinks, plans and executes the plan at that level, the criminality of his act cannot be denied, wholly or partially, because, although he did not realize it, his conscious was influenced to think, to plan and to execute the plan by unconscious influences which were the product of his genes and his lifelong environment.

827 F.2d at 906 (quoting *New Jersey v. Sikora,* 44 N.J. 453, 210 A.2d 193, 202 (1965)).

Nowhere does the report indicate that Montgomery was not aware or in control of his actions. Because the report's observations are inapposite to the narrow issue of mens rea, we will affirm the District Court's exclusion of the evidence.

### III. Conclusion

For the foregoing reasons, we will affirm the judgment of sentence.[8]

---

**8.** Montgomery also argues that the District Court erred in its response to two jury questions, and in its denial of a motion to suppress the wiretap evidence. We have reviewed these contentions and the voluminous record, and conclude that these arguments are without merit.