**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2115

UNITED STATES OF AMERICA


v.

FRANK NUCERA, JR.,
                              Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No.: 1-17-cr-00532-001)
District Judge: Hon. Robert B. Kugler
_____

Argued November 7, 2022

(Filed May 5, 2023)

Before:  JORDAN, SCIRICA, and RENDELL, *Circuit Judges*.


Rocco C. Cipparone, Jr.,Esq.        [Argued]
Rocco C. Cipparone, Jr.,
Law Offices

157 Bridgeton Pike
Suite 200-320
Mullica Hill, NJ  08062


*Counsel for Appellant*

Sabrina G. Comizzoli, Esq.       [Argued]
Mark E. Coyne, Esq.
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102


*Counsel for Appellees*
_____

OPINION OF THE COURT
_____

**RENDELL,** *Circuit Judge*.

    Trial evidence often divides jurors. In a trial about race with jurors of different races, that division can be explosive. Frank Nucera, Jr. says those divisions ran so deep in his trial that they tainted the verdict, and he seeks a new trial or an evidentiary hearing to probe what happened. To support his claim, Nucera offers only post-verdict affidavits from jurors who say they experienced racial vitriol, intimidation, and other misconduct that occurred during the jury deliberations.

When parties challenge a verdict, Federal Rule of Evidence 606(b) bars a court from considering a juror's statement or affidavit unless it satisfies either an exception in the Rule or a constitutional exception created by the Supreme Court in *Peña-Rodriguez v. Colorado*, 580 U.S. 206 (2017), for evidence of racial bias. But the latter exception is narrow and specific: it requires a clear statement that a juror voted for conviction based on racial animus toward, or stereotypes about, *the defendant*.

Nucera was charged with committing a hate crime, depriving another of his civil rights, and making false statements to the FBI, all associated with actions he took as a police officer arresting a man named Timothy Stroye. His evidence of purported juror misconduct shows heated deliberations with racial tensions playing a major role. Credibility determinations were crucial, and jurors divided deeply over whom and what to believe. But none of his evidence satisfies the exceptions in Rule 606(b). Nor does it show that what happened here fits the exception in *Peña-Rodriguez*. Lacking the clear statement that *Peña-Rodriguez* requires, Nucera urges that we should widen the exception to include the conduct here. That we cannot do. So we will affirm the District Court's denial of Nucera's motion for a new trial, and an evidentiary hearing, based on juror misconduct.

We will also affirm the District Court's ruling that limited Nucera's use of the victim's out-of-court statement and

the Court's later instructions to the jury about unanimity.[1] But we agree with Nucera that the District Court erred in sentencing him, so we will vacate the District Court's sentencing order and remand for further proceedings consistent with this opinion.

## I.     NUCERA'S TRIAL

### A.     Jury Selection

When the trial began, the District Court conducted *voir dire* of potential jurors and briefly described some of the evidence jurors would hear in the case. Jurors would "hear testimony that the defendant Mr. Nucera used racial epithets [that] included the N-word." App. 149. And they would hear Nucera "allegedly used excessive force" against a Black man named Timothy Stroye during Stroye's arrest because Nucera was "racially motivated" to do so. App. 149. So the District Court stressed the need for jurors to decouple "[Nucera's] use of . . . the racial epithets" from the allegations of "excessive force [and] racial motivation" because Nucera's bad language was not "in and of itself a crime." App. 149–50.

On the second day of jury selection, the District Court and the parties questioned Pamela Richardson, a Black woman and former pharmaceutical sales rep who retired because of a long-term disability. Like other prospective jurors, Richardson

---

[1] As we discuss below, the District Court excluded the statement itself but allowed Nucera to allude to certain facts it contained without attributing it to any specific individual.

had provided over 100 written responses to a questionnaire from the parties that explored various subjects, including her personal experiences with racism, her feelings about members of law enforcement, and her ability to be impartial.

The responses revealed that Richardson had a "relative or close friend" who had been "charged with [a] crime or been the subject of [an] investigation[.]" App. 134. But she denied that the matter would "affect [her] ability to be fair and impartial" or "otherwise make it difficult for [her] to sit as a juror in [the] case." App. 134. Richardson also responded "yes" to a question which asked if she believed someone who uses "racially charged derogatory words" was "inclined to act with physical aggression as well." App. 141. But under questioning by the Court and counsel, she explained that people in a professional setting would stop to think "oh, my pension, my kids, my house, am I willing to put that on the line to become violent, and most [of those] people [would not]." App. 155.

Lastly, she described incidents involving her sons being stopped by police, but she denied holding a "grudge" against the police for what happened. App. 152. She then explained the complexities of how she had to interpret what her sons told her based on their personalities, their ages, and her relationship with them. And when the District Court asked if the incidents would affect her view of the evidence, Richardson said they would not. The District Court seated Richardson without objection.

## B. The Trial Evidence

The Government's case against Nucera centered on his alleged assault of Stroye, during an arrest. A grand jury returned an indictment charging Nucera with three offenses: one count of committing a hate crime, in violation of 18 U.S.C. § 249(a)(1), another count of depriving a person of civil rights, in violation of 18 U.S.C. § 242, and a third count for later making a false statement to the FBI about what happened, in violation of 18 U.S.C. § 1001(a)(2).

Nucera's trial began on September 20, 2019. Jurors learned that he served as both the Chief of the Bordentown Township Police Department (BTPD) and the Township's Business Administrator. On September 1, 2016, officers under Nucera's command responded to a local hotel manager's complaint that Timothy Stroye, a Black man, was staying in a room he had not paid for and was using the swimming pool. The jury heard evidence from Captain Shawn Mount that he and Detective Sergeant Salvatore Guido arrived first, confronting Stroye and his girlfriend on the first floor. Ignoring commands to stop for questioning, both Stroye and his girlfriend used a nearby stairwell to go up to the second floor. A short time later in the second floor hallway, Mount and Stroye soon found themselves locked in combat for several minutes before Stroye finally went to the ground, just as backup officers from BTPD and other nearby departments came to help Mount make the arrest.

When the dust settled, officers patted Stroye down, handcuffed him, and led him to the nearest stairway. Sergeant

6

Nathan Roohr testified that he stood behind Stroye when, a short time later, Nucera approached from behind, "lunged his hand forward," grabbed Stroye's head "like a basketball and slammed it into the metal doorjamb" separating the hallway from the stairwell. Supp. App. 266–67. Roohr said the impact was so hard that it made a "loud thud." Supp. App. 267.

Guido had a different vantage point. He testified that he first took Stroye's girlfriend into custody, then he led Stroye out of the hallway. Guido put the handcuffed Stroye in "an escort position" by "linking up" his left arm and Stroye's right arm so the two could enter the stairway together. Supp. App. 777–78. Guido remembered that Stroye was agitated and spewing profanities but posed no physical threat to anyone. Stroye "hesitated" at the entrance, so Guido "[ga]ve him a little, little nudge to get through the door[.]" Supp. App. 779. Guido testified that, at that moment, he felt a "force from behind" and then saw "Chief Nucera's arm in [his] peripheral vision . . . pushing the back of Mr. Stroye through the door." Supp. App. 779.

Guido testified that the doorway had limited space, so the force Nucera used was enough to cause him and Stroye to strike opposite sides of the doorway with their bodies. And even though Nucera appeared only in his peripheral vision, Guido testified that he knew Chief Nucera was the instigator because he and Nucera were the only officers on the scene in plain clothes, and he recognized the distinctive peach color of Nucera's shirt. Guido presumed that Nucera pushed Stroye "because . . . he wasn't moving fast enough," but he described

7

the act as "embarrassing" and noted that "it wasn't needed at all." Supp. App. 779.

After the incident, Roohr returned to the police station with Nucera and used his cell phone to record what Nucera had to say. The recording captured Nucera using venomous and racist language about the Black people the BTPD had encountered:

> I'm fucking tired of them man. I'll tell you what, it's gonna get to the point where I could shoot one of these motherfuckers. And that nigger bitch lady [referring to Stroye's girlfriend's aunt], she almost got it.
>
> * * * *
>
> [After learning Stroye, his girlfriend, and her aunt were from Trenton] Stay the fuck out of Bordentown. . . . It would have been nice if that fucking [police] dog could have come up. 'Cause they would have stopped, put down.
>
> * * * *
>
> That dog, that dog will stop anything right then and there. [Nucera makes barking noises.]

I'm telling you. You'd have seen two fucking niggers stop dead in their tracks. [Nucera laughs.] I love that when they do that. I just love that.

Supp. App. 1335, 1337. The jury also heard a recording in which Nucera called someone a "[f]ucking little, fucking nigger," Supp. App. 1342, which Roohr testified was a reference to Stroye,  Roohr filed an official report that did not refer to the alleged assault.[2] But he later reported the incident to the head of the BTPD's Internal Affairs unit, Brian Pesce. A few weeks later, Roohr took the same information to FBI Agent Jacob Archer, whom he knew personally and professionally for several years.  Based on Roohr's evidence, the FBI launched an investigation and questioned Nucera in an interview that agents recorded without his knowledge.  During the interview, which the Government played for the jury, Nucera denied ever touching Stroye, let alone slamming his head into the doorjamb.

Roohr also testified that Nucera had often used racial epithets aimed at Black people. For example, nearly a year before the incident, Nucera told him "[t]hese niggers are just like ISIS, they have no value. They should line them all up and mow them down. I would like to be on the firing squad." Supp. App. 280–81. And jurors heard another audio recording where Nucera explained to Roohr, a K-9 handler, how to use his

---

[2] But Roohr testified that fear of retaliation led him to withhold the details of Nucera's assault from his police report.

police dog to intimidate Black people—whom Nucera called "fucking moulies." Supp. App. 305–06, 1343–46.

Nucera offered his own evidence to challenge several aspects of the Government's case. For example, he presented evidence that no other officers in close enough proximity heard a loud thud. Of the nearly four dozen witnesses interviewed by the FBI, only Roohr said he heard the sound. And none of the other interviewed witnesses saw Nucera touch Stroye, including the two other police officers at the scene. Nucera also exposed inconsistencies between Roohr's testimony and what Roohr told the grand jury about how the touching occurred, including his uncertainty about which hand Nucera used. Likewise, Nucera offered evidence that Guido's story had changed several times, ultimately forcing him to all but admit that he had no independent recollection of seeing Nucera push Stroye.

Nucera even challenged the basic facts of the assault and where he was when it happened. He drew testimony from Roohr that he (Roohr) had told the grand jury Guido was the one who gave Stroye a "hard push" after Stroye stopped in front of the second-floor doorway. Supp. App. 386. He also got Roohr to admit that Stroye was "passively resisting" Guido by stopping as he did. Supp. App. 386–87. And he obtained testimony from Mount that Nucera remained by his side for the longest time of anyone at the scene, eventually insisting that Mount go to the hospital.

Having challenged Roohr's version of events, he also highlighted Roohr's credibility problems. Roohr deleted several recordings aside from the one capturing Nucera's racial tirade after the incident. The evidence also suggested Roohr had an axe to grind with Nucera over his leadership of the department, including how he distributed opportunities to earn overtime pay.And Roohr took his allegations to FBI Special Agent Archer despite knowing the two men "mutually disliked" one another after Archer had "unseated [Nucera] as a fire commissioner in Bordentown Township[.]" Supp. App. 569.

Finally, Nucera challenged the FBI's conduct. On cross-examination, he got the FBI's witness to admit that at least one person told him the incident happened at a different location than Roohr and Guido claimed, and it involved a person not matching Nucera's description. He also cast doubt on the way the FBI treated him. Agents gave him no notice of the interview, nor did they reveal it was being recorded. Still, he voluntarily spoke with agents for about an hour and his responses to their questions corroborated what Officers Nagle and Mount said during FBI supervised recordings Roohr made during the investigation. He also offered evidence that, unlike Roohr, he made no efforts to destroy or conceal information and even offered to have Pesce give the FBI any materials they sought.

## II. ALLEGED JUROR MISCONDUCT

Nucera focuses much of his juror misconduct claim on the deliberations, and he uses statements from jurors to support

11

it. Before reviewing what happened in the deliberations, and to frame our analysis, we summarize key limits on a court's ability to consider the type of evidence Nucera offers when seeking a new trial. In short, one rule of evidence and two Supreme Court cases control the outcome. First, Federal Rule of Evidence 606(b) limits the evidence from a juror that courts may consider when used to challenge a verdict:

> (1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> (2) *Exceptions*. A juror may testify about whether:
>
> (A) extraneous prejudicial information was improperly brought to the jury's attention;
>
> (B) an outside influence was improperly brought to bear on any juror; or

12

(C) a mistake was made in entering
the verdict on the verdict form.

Fed. R. Evid. 606(b). And two recent Supreme Court cases impose added constraints.[3] First, the Court held that "Rule 606(b) precludes a party seeking a new trial from using one juror's affidavit of what another juror said in deliberations to demonstrate the other juror's dishonesty during *voir dire*." *Warger v. Shauers*, 574 U.S. 40, 42 (2014). But the Court explained that the no-impeachment bar applies generally "[d]uring an inquiry into the validity of a verdict." *Id*. at 44. Whatever its specific basis, a motion for a new trial based on juror misconduct "plainly entails" such an inquiry because a successful claim will overturn the verdict. *Id*. at 44–45. So Rule 606(b) bars the use of a juror's affidavit to show that another juror engaged in *any* misconduct, not just dishonesty during *voir dire*. *See id*.

Later, in *Peña-Rodriguez*, the Court carved out a narrow constitutional exception for evidence showing racial bias during the deliberations. There, one juror said the defendant was guilty of sexual misconduct "because [he was] Mexican and Mexican men take whatever they want" and also because the defendant's alibi witness was "an illegal." *Peña-Rodriguez*, 580 U.S. at 213. The Court held that "where a juror makes a clear statement that indicates he or she *relied on racial*

---

[3] Though several cases affect our analysis, we briefly discuss the two Supreme Court cases here because they are the most significant. We fully analyze the relevant legal framework below.

13

*stereotypes or animus to convict* a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id*. at 225 (emphasis added).

With those rules in mind, we now examine what occurred during the jury deliberations in Nucera's trial.

## A.    Jury Deliberations

The District Court charged the jury and deliberations began on October 2, 2019. Though twelve jurors decided Nucera's fate, only nine[4] are relevant here: Foreperson Kia Lipscomb, Juror One (Black); Juror Two (White); Juror Three (White); Juror Four (White); Juror Five (White); Juror Six (White); Juror Nine (Black); Juror Eleven (White); and Pamela Richardson, Juror 12 (Black). Over the first few days, the jury asked to examine Roohr's testimony and also sought to clarify the definition of "reasonable doubt." Supp. App. 1276–91. But things soon hit a roadblock.

On the fifth day of deliberations, the jury notified the District Court it was "unable to come to a unanimous decision." Supp. App. 1293. The District Court asked for the

---

[4] Except for Lipscomb and Richardson, both of whom gave public interviews, we omit the names of the jurors because of privacy concerns and the affiant-jurors' specific requests not to have their names shared publicly.

parties' guidance on how to move forward, and at the Government's urging, the Court convened the jury and issued a reminder to "make every reasonable effort . . . to reach unanimous agreement." Supp. App. 1295. But the District Court stressed the jury should "reach unanimous agreement . . . only if [they could] do so honestly and in good conscience." Supp. App. 1295–96. Finally, the District Court asked jurors to "make another effort" at reaching an agreement and sent them back to deliberate. Supp. App. 1296.

Late the next afternoon, the jury sent another note to the District Court: "[i]f we are unanimous on one count, but deadlocked on the other two, what is our next step[?]" Supp. App. 1299. Nucera's counsel suggested—and the Government agreed—to have the District Court give Third Circuit Model Jury Instruction 9.08 governing partial jury verdicts. The District Court called in the jury, read back their question, and then gave the requested instruction: the jury "[did] not have to reach unanimous agreement on all the charges before returning a verdict on some of them," and they could either deliver their partial verdict, then resume deliberating on the rest, or they could "wait until the end of [their] deliberations and return all [their] verdicts then." Supp. App. 1300–01. With those instructions in mind, the jurors returned to deliberate before later asking the District Court to release them for the day.

On day seven, the jury sent a third note to the District Court that read simply "[w]e have come to a unanimous decision on Count [Three]." Supp. App. 1305. The District Court then brought the jury in, and the jury returned a

15

unanimous verdict as to Count Three.The District Court then polled the jury to "ask each of [them] in turn if [they] agree[d] or disagree[d] with the verdicts as announced by Miss Lipscomb" and "found [the jury members] to be unanimous."Supp. App. 1309. With that done, the District Court ordered the verdict filed and gave the jury members a choice to declare themselves deadlocked on Counts One and Two or keep deliberating.The jury members chose to keep deliberating.

Two days later, deliberations broke down for good. In a final note to the District Court, the jurors said they were deadlocked on Count One and Count Two of the indictment, charging Nucera with a civil rights violation and a hate crime, respectively. The District Court asked the jurors "whether [they] believe[d] there [was] any reasonable possibility that further deliberations would yield a unanimous verdict on either of [those] counts[.]" Supp. App. 1319. The answer was no. So the District Court granted Nucera's request for a mistrial due to the impasse and discharged the jury.

Soon after the trial, Jurors Two, Three, Four, and Eleven approached Nucera's counsel with allegations of juror misconduct. Each swore an affidavit recounting specific instances of alleged misconduct they witnessed both before and during deliberations. In one of the allegations, Juror Two recalled that, before deliberations, Juror Richardson said that she had served on a jury before and told those jurors, "[h]ope you are all thinking guilty, I can be here all day, I have f***king nowhere [sic] to be," App. 189, apparently signaling

16

that she had reached the same conclusion in Nucera's trial. In another incident after deliberations started, jurors debated about the meaning of the words "unreasonable" and "unnecessary" as it related to the first two counts of the indictment. App. 177–78, 186, 200, 210. All four affidavits agree that Juror Six tried to end that debate: after consulting "three different sources," Juror Six offered his fellow jurors definitions of the words that he had looked up the night before. App.210.

Still, the bigger problem was the volatile mix of the evidence with issues of race and racism. The affidavits depicted a worsening divide between those favoring conviction and those favoring acquittal. On one side sat nine jurors who would vote to acquit Nucera, and on the other were three jurors—all Black women—who thought Nucera was guilty on each count. Based on that division, Juror Eleven told the others he "wanted to point out 'the elephant in the room'" that the three Black jurors "were perhaps looking at things through a 'different lens[.]'" App. 202. Juror Eleven recalled that Richardson responded by saying "no shit, Sherlock, we're Black," and that she questioned why she was chosen for the jury after she admitted at *voir dire* that she had a "problem with cops." App. 202.

Juror Three described an atmosphere rife with "bullying, racial tensions, and unfounded accusations," all of which she said affected the deliberations. App. 166–67. Juror Four was more specific, noting that each time she "tried to express [her] thoughts on the evidence," she found herself

17

"shut down" by Juror Richardson and Juror Nine despite pointing to "clear evidence" that supported her position. App. 180–81. Based on those dynamics, the four affiants—all of whom are White—said they shared a belief that Nucera was innocent of any crime, but each said they yielded to pressure from other jurors to convict him of something so they would not be painted as a racist.

In addition, each affidavit identified Richardson's various statements as the main source of the jury room's strife. During the deliberations, Richardson described how her older son—who worked as a pharmacist—endured three traffic stops late the same night and in adjoining New Jersey towns, saying each was for "driving while Black." App. 171, 182, 190, 205. She also told jurors about a time her younger son was working in his own yard at night when police approached and put him in custody because "he could not produce a key." App. 183. Though he was "later released with an apology," Richardson said the incident happened only because "her son 'was black, a black man doing yard work,'" App. 191, adding that police officers in the town followed her son for weeks after the incident. Richardson explained that those kinds of experiences were the reason that mothers of Black boys must teach them how to interact with police and submit to their commands. AndJuror Three remembered Richardson saying that because of those experiences, "she would be hard-pressed to return to her sons and her community without a conviction or jail time for Frank Nucera." App. 172.

18

After the partial guilty verdict, Richardson fought through tears as she recounted her experiences "growing up Black in the South." App. 197. In one example, she told fellow jurors she had to "urinate on the side of the road in a mayonnaise jar when traveling with her parents because she was not allowed to use the 'whites only' restroom[s]" they passed along the way. App. 197. And in another, she described "having been made to leave places as a child because of her skin color." App. 197.

Those stories brought Jurors Five and Six to tears. Juror Six hugged Richardson and told her, "I'm sorry, I'm so sorry, I remember those days." App. 175. Juror Eleven also remembered Juror Six telling him that "he felt the need to make 'reparations'" both for the "overall treatment of African Americans" and because of his own "past bad behavior[.]" App. 207. And a tearful Juror Six added that he had "been around a long time" and if the jury did not convict Nucera, "these things will continue to happen[.]" App. 177.

Yet if Richardson's stories of living in the South under Jim Crow unleashed tears, her other statements sparked a firestorm. While the jury was deadlocked on the first two counts, Richardson declared, "Every time I hear someone in this room say 'I'm not prejudiced, I have a black friend,' if I had a gun, I would shoot each one of you." App. 176. Stunned silence blanketed the room, broken only when Juror Eleven asked, "who can speak after statements like that[?]" App. 204. Juror Eleven said Richardson responded that she was "sure [he had] gone about [his] day before when other racist things

19

happened and it was no big deal to [him]." App. 204. Likewise, Juror Three recalled sharing her views about why Nucera was not guilty, only to have Richardson purportedly accuse her of "just want[ing] 12 white jurors." App. 192.

Finally, the affidavits also pointed to other alleged threats and intimidation in the jury room. When the jury first deadlocked, Juror Five slammed the table and yelled "mother***er, I'll be damned if we let this guy walk. I'll sit another three weeks until we can convict this guy." App. 191. Days later, and before the jury reached its unanimous guilty verdict on Count Three, Juror Two approached the Deputy Clerk to report "disrespect and racial comments that were being made in the jury room during deliberations." App. 194. She told the Clerk, "in essence[,] that some of [the] jurors were being called racists by other jurors." App. 194. The Clerk instructed that "if [she] had any further issues, [she] should write a note to the [j]udge." App. 194. Juror Two never did: she noted there was paper available but no envelopes, and without a way to seal her note, she was concerned that Lipscomb would read it before it left the room. [5]

During a break the next day, Juror Four said she overheard Juror Five tell a court security officer he "felt like ripping the sink off the wall in the bathroom." App. 184. Juror Two said things were so tense that she asked a court security

---

[5] The record does not otherwise reveal that the Clerk made the District Court aware of Juror Two's concerns, or that the District Court shared them with the parties.

officer to tell the Deputy Clerk that the matters she raised before "had gotten worse." App. 198. The court security officer returned with a message from the Deputy Clerk that the District Court had given jurors an added 30-minute break during which they could leave the courthouse with their cell phones. Later, the judge met with jurors in the jury assembly room to discuss what was happening in deliberations, and Juror Two recalled crying as she told the judge "there was serious disrespect going on in the jury room," yet she was uncertain if she mentioned any threats. App. 198–99. After hearing the jurors' concerns, the District Court stressed that "personal feelings [had] to be left out of the deliberation room" and instructed the jurors "to go back into the deliberation room and to decide" if they wished to continue. App. 199.

But the affiants were not the only jurors to discuss the deliberations. The day trial ended, Richardson and Lipscomb sat for an interview with the *Philadelphia Inquirer* to describe what happened. Richardson said she feared a possible deadlock as early as "the second day of deliberation[.]" App. 162. She also said the Government's recordings "helped to convince her that Nucera was guilty of" the assault on Stroye. App. 162. And she explained why:

> When somebody used the racist commentary that he has used his whole life, and it's on tape, the racist things he said, you just automatically have to assume that he would do something to somebody[.] I mean, it's on tape

21

> where he said he wished the two people were still outside so that he could sic the dogs on the n----s because that would've put them down.

App. 162. Lipscomb added that the jurors "all kind of agreed that the extensive racial piece of it was absolutely there, and that it was an atrocity." App. 163.

Richardson noted that deliberations soon became all about the race of the jurors. She recalled when Juror Eleven challenged the perspective of the Black jurors, but she said it happened differently than the way he described it. Rather than observe they were viewing things through a "different lens," Richardson said that Juror Eleven was more direct: "The only reason you African American women are voting this way is because you're black." App. 163. Richardson confirmed her acerbic reply of "[n]o s—t, Sherlock." App. 163. But she added that, "[t]he next morning, [a] white juror [with] black family members confronted" Juror Eleven about the comment he made. App. 163.

The jurors also split over whether to believe key pieces of evidence implicating Nucera. Lipscomb explained that "the jury struggled with the testimony of Sgt. Nathan Roohr and Detective Sgt. Salvatore Guido, the township police officers who implicated Nucera" with their eyewitness testimony. App. 164. According to Lipscomb, the three holdouts "really felt that they couldn't trust their testimony." App. 164. Plus, the jury found it difficult "to agree on whether Stroye was struck in the

22

head" as the Government had alleged, and that was a hard question to resolve because neither side called Stroye to testify even though he had been subpoenaed. App. 164.

Richardson also described how the consensus shifted to favor guilt. By the final day, after the guilty verdict had been rendered on Count Three and the jurors were focused on Counts One and Two, the nine votes favoring acquittal on the first two counts of the indictment became nine votes favoring conviction, and those jurors started the session with an effort "to persuade the other three to see their side." App. 164. During that attempt, Richardson remembered that three or four of the men who believed Nucera was guilty broke down into tears. But the holdouts refused to accept Roohr's and Guido's version of events, and so the jury agreed to tell the District Court they could not continue. Adding a final exclamation to the holdouts' resistance, "[o]ne white male juror, who was in favor of acquittal, stood in the jury box defiantly with his arms crossed" as the District Court closed the proceedings. App. 164.

### B.    Nucera's New Trial Motion

Nucera moved for a new trial and requested an evidentiary hearing. Nucera urged that Richardson gave materially false answers during *voir dire* to conceal her biases, and he also claimed that Richardson and others engaged in misconduct that tainted the jury's verdict on Count Three of the indictment. And he connected those allegations with the assertion that Richardson's various statements during and after deliberations supplied the evidence that she lied during *voir*

23

*dire*. As evidence of the alleged misconduct, Nucera offered the four juror affidavits, Richardson and Lipscomb's interview in the *Inquirer*, and a Facebook post Richardson wrote on September 17, 2014.[6]

The District Court noted that Nucera's evidence faced an immediate problem: Rule 606 prohibits "receiving an affidavit or evidence of a juror's statement, except in three circumstances" set forth in the Rule or the constitutional exception for racial bias under *Peña-Rodriguez*. Supp. App. 1348. Nucera responded that the alleged misconduct triggered the exceptions of Rule 606(b)(2)(A), allowing evidence of extraneous prejudicial information, and Rule 606(b)(2)(B),

---

[6] Richardson's Facebook post addressed the perceived lack of accountability law enforcement officers face for domestic violence:

> Now that professional athletes are losing money and jobs due to their poor behavior against children and women, when are correctional officers and policemen going to be sanctioned? Does this mean that one day we are going to ask for all men to stop the violence against women and children? But can we one day get to the point there is no violence at all? Oh, I must be dreaming . . . but it's a great dream.

App. 159.

24

allowing evidence of an improper outside influence. He also urged the District Court to hold that the racial bias exception of *Peña-Rodriguez* applied because the evidence showed that pervasive, general racial animus in the deliberations tainted the verdict and denied him a fair trial.

The District Court denied Nucera's request for a new trial, concluding that the evidence of alleged misconduct fit none of the exceptions in Rule 606(b)(2), and none of the materials showed the "clear, strong evidence of juror misconduct" that our precedent requires for a hearing. Supp. App. 1397. The District Court explained that the rules against impeaching jury verdicts are "very strong and very narrowly construed," Supp. App. 1399, compelling certain findings from the Court about the evidence Nucera used to support his claim.

The District Court began with the allegations that Juror Six presented definitions of two words to other jurors at the end of deliberations. Though the Court agreed their use was improper, it concluded that Nucera presented no evidence that the use prejudiced him because the affidavits did not show the incident happened before the guilty verdict on Count Three. Instead, the evidence supported a finding that Juror Six used the definitions *after* the guilty verdict because the words "had no relationship whatsoever to the law that governed the decision in Count [Three]," Supp. App. 1399, while they did relate to Count Two, "for which there was no verdict." Supp. App. 1352.

Next, the District Court turned to the allegation that Richardson's stories injected racial bias into the deliberations. Based on the record Nucera developed, the narrow racial bias exception of *Peña-Rodriguez* did not apply because the District Court read *Peña-Rodriguez* to hold that "only when the evidence shows that the racism and the race of the defendant was what caused the conviction that the Court can inquire to ensure that the conviction was not based on racism." Supp. App. 1400. But the District Court found that "none of the affidavits [said] that any of the jurors . . . who voted guilty . . . did so because of [Nucera's] race. " Supp. App. 1356. More, the District Court observed that every court to decide the issue had "rejected extension of *Peña-Rodriguez*" to the scenario Nucera alleged. Supp. App. 1401; *accord* Supp. App. 1362 (discussing *United States v. Robinson*, 872 F.3d 760 (6th Cir. 2017) and *Williams v. Price*, No. 2:98cv1320, 2017 WL 6729978 (W.D. Pa. Dec. 29, 2017)).

But the District Court reasoned that even if Nucera's position found support in the caselaw, the nature of *his* case undermined the argument that Richardson was wrong to inject race into the deliberations:

> THE COURT: [T]his is such an unusual case. This is not just a regular case where the race of a plaintiff or a defendant or, you know, the victim and aggressor are different. This is a case where race is an element of the crime. It is alleged to be the motive behind the

> alleged crimes. You've got to have
> discussions of race and racism.
> Just by definition, the jury's going
> to have to have those discussions
> in order to reach a verdict.

Supp. App. 1364. The District Court concluded that all Richardson had done was bring her life experiences to bear on how she viewed the evidence, which is precisely what courts expect jurors to do.

The District Court also disposed of the allegations that threats and intimidation undermined the fairness of deliberations. To start, Juror Two's affidavit was the first evidence the District Court received of comments about shooting other jurors or ripping the sink off the wall, and the Court zeroed in on Juror Two's concession that she was not sure she raised the issue when jurors met with the District Court to discuss their concerns. Yet even if she had, the timeline in Juror Two's affidavit showed the alleged threats[7] occurred *after* the jury found Nucera guilty on the false

---

[7] The District Court also questioned whether Richardson's statement was even a true threat, noting Richardson did not say, "if you don't vote to convict, I'll shoot you in the head" but rather used the phrase "out of frustration" about White jurors saying they could not be racist because they have a Black friend or relative. Supp. App. 1366. At any rate, the District Court made it clear that had "there [been] any indication of any threats," the Court "would have done something about that at the time[.]" Supp. App. 1366.

27

statements charge in Count Three and thus could not have affected that part of the verdict.

Finally, the District Court turned to Nucera's argument that Richardson lied during *voir dire*. After acknowledging that *Warger* barred Nucera's evidence to support that claim, the District Court still addressed the merits of the argument and concluded that Nucera's evidence did not show Richardson lied during *voir dire*. The Court first noted the relevant facts that Richardson provided: she revealed her children's interactions with police; she said she could separate bad words from deeds; and though she said professionals who use derogatory language were less likely to also commit bad acts, she never said that was always true. The District Court explained that Richardson was seated based on the conclusion she was truthful in those answers—a conclusion Nucera never challenged, let alone displaced, during the *voir dire* process.

The District Court also found that Richardson's *Inquirer* interview and Facebook post did not show her *voir dire* answers were false. Contrary to Nucera's argument, the *Inquirer* interview did not show Richardson lied during *voir dire* about whether people act in accordance with hateful language; it showed that she concluded *Nucera* had the propensity to do so after hearing the full extent of his racist language—particularly the recorded threats to sic dogs on Black people—which had a different effect on her than the District Court's brief references to racial slurs during *voir dire*. Likewise, the District Court found Richardson's Facebook post was "innocuous" and did not show she lied about antipolice

28

bias during *voir dire*. Supp. App. 1401. Instead, the District Court noted, the post showed Richardson's "frustration with violence against women" and her perception that police officers who perpetrate such violence often escape accountability. Supp. App. 1401.

For all those reasons, the District Court denied Nucera's motion for a new trial without an evidentiary hearing. The District Court later sentenced Nucera to 28 months on Count Three using a cross reference and an upward variance under the Sentencing Guidelines, which Nucera also challenged and later raised on appeal. Almost two years later, the Government tried Nucera again on the two charges that hung the jury in the first trial. But the second jury deadlocked too, and at the Government's request, the District Court declared another mistrial.

Nucera timely appealed.

### III.   JURISDICTION

The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231, and our jurisdiction is proper under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

### IV.   RELEVANT LEGAL STANDARDS

### A.   Claims of Juror Misconduct

When a defendant moves for a new trial based on jury misconduct, we review the denial of that motion for an abuse

of discretion. *See United States v. Noel*, 905 F.3d 258, 266–67 (3d Cir. 2018). The "district court's discretion over a new trial motion [includes determining] whether an evidentiary hearing is necessary." *Id.* at 270 n.7 (collecting cases). To get a new trial, a defendant must (1) "file the motion within fourteen days of the verdict unless the motion is grounded on 'newly discovered evidence'" and (2) "show that a new trial is in the interest of justice." *Id.* at 270 (quoting Fed. R. Crim. P. 33). A movant receives an evidentiary hearing only where the allegations "rise to the level of clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *United States v. Claxton*, 766 F.3d 280, 301 (3d Cir. 2014) (cleaned up).

### B. Allegations of Juror Dishonesty During *Voir Dire*

In denying Nucera's motion, the District Court considered the merits of his allegations that Richardson lied during *voir dire*. But as we explained above, the Supreme Court's opinion in *Warger* forecloses us from doing the same: "Rule 606(b) precludes a party seeking a new trial from using one juror's affidavit of what another juror said in deliberations to demonstrate the other juror's dishonesty during *voir dire*." 574 U.S. at 42. *Warger* thus bars Nucera's use of the juror affidavits to prove this part of his claim.[8]

---

[8] As we note *infra,* in *Warger*, the Court included a footnote alluding to possible cases of juror bias "so extreme" as to

The same holds true for his other evidence. Based on *Warger* and our own decision in *United States v. Lakhani*, 480 F.3d 171 (3d Cir. 2017), we conclude Rule 606(b) still bars the use of a juror's statement when it appears in something other than an affidavit and even when the juror makes the statement publicly. In *Lakhani*, a defendant convicted for trying to import missiles sought a new trial after a juror came forward to say that other jurors engaged in misconduct during deliberations. 480 F.3d at 184. That juror appeared on a public radio show to say she thought the Government had entrapped the defendant and she voted guilty only after yielding to intimidation from fellow jurors. *Id.* Even though the juror told her tale on the radio, rather than in an affidavit or other writing, we still held it was so obvious that Rule 606(b) barred the use of her statement that we found it difficult to explain "beyond stating the rule itself[.]" *Id.* at 185. Richardson's and Lipscomb's statements to the *Inquirer* are much the same as the juror's public statement in *Lakhani*, and thus Rule 606(b) likewise bars their use to show Richardson's dishonesty.

Lastly, although Rule 606(b) presents no obstacle to considering Richardson's Facebook post, we agree with the District Court that it does not show Richardson gave dishonest *voir dire* answers or harbored antipolice bias. Like the District Court, we conclude the post shows Richardson's specific

warrant an exception, but we find nothing in Richardson's *voir dire* responses that constituted misconduct, let alone an extreme case. Instead, we find the District Court's analysis of this issue to be reasonable.

31

frustration with a perceived lack of accountability for members of law enforcement that commit domestic violence. That is a long way from general antipolice bias. It also does not show that her *voir dire* answers were false. Nothing that she said in the Facebook post contradicts or was inconsistent with her responses to questions in *voir dire*. We agree with the District Court that the post was "innocuous." Supp. App. 1401. Beyond that, we note Richardson wrote the post *five years before* Nucera's trial, and nothing in the record suggests she tried to conceal its existence at any point.

In sum, none of Nucera's evidence supporting the claim of juror dishonesty escapes Rule 606(b) and *Warger*. Because he offers no other meaningful evidence to support those allegations, we conclude that the District Court did not abuse its discretion, and so Nucera's challenge to the verdict on that basis falls short.

### C. Rules and Jurisprudence Governing Juror Misconduct Evidence

Juror misconduct claims implicate the Sixth Amendment's guarantee that criminal defendants will get a fair trial by an impartial jury. Yet they also threaten the important principle that juries get the last word when they render a verdict. To square things, Federal Rule of Evidence 606(b) limits the evidence that defendants can use to prove they did not get a fair trial. Once the jury enters its verdict, a defendant may not use "a juror's affidavit or evidence of a juror's statement" to question the verdict unless the exceptions in the Rule, which we outlined above, apply. Fed. R. Evid. 606(b).

So, in general, a defendant cannot question the validity of the verdict using a juror's affidavit or any evidence of a juror's statement to probe (1) statements jurors made or incidents that happened during deliberations; (2) anything that affected any juror's vote; or (3) a juror's mental processes about the verdict. But a defendant may do so if the evidence shows one of three things happened: (1) a juror learned of prejudicial information from outside the deliberations; (2) a juror succumbed to an improper outside influence; or (3) a mistake occurred when entering the verdict or completing the verdict form.

As the Supreme Court has explained, the roots of Rule 606(b) run deep in the soil of English common law. *See Peña-Rodriguez*, 580 U.S at 215(discussing *Vaise v. Delaval*, 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785)). Since the Rule's inception, the Supreme Court has made three major pronouncements about when and how it applies. First, in *Tanner v. United States*, 483 U.S. 107, 121–22 (1987), the Court held that Rule 606(b) barred a juror's post-verdict statement to show that jurors engaged in misconduct during trial and in deliberations. The Court's decision rested on two principles. To start, the Court observed that, were it to recognize a constitutional exception to Rule 606(b), such a holding would have flooded the system with challenges to verdicts, which, in turn, would encourage juror harassment and destroy the "frankness and freedom of discussion and conference" inherent in "what was intended to be a private deliberation." *Id.* at 120 (quoting *McDonald v. Pless*, 238 U.S. 264, 267–68 (1915)). And the Court reasoned that the jury system already had adequate

33

safeguards to protect a defendant's Sixth Amendment rights—the *voir dire* process, surveillance by court staff, and the ability of jurors to come forward *before* the jury reached a verdict. *Id.* at 126–27.

Later, in *Warger*, the Court extended *Tanner* to hold that "Rule 606(b) precludes a party seeking a new trial from using one juror's affidavit of what another juror said in deliberations to demonstrate the other juror's dishonesty during *voir dire*." *Warger*, 574 U.S. at 42. There, the Court affirmed the denial of a new trial for an injured plaintiff based on juror affidavits alleging the jury's foreperson concealed her bias in favor of the defendant. *Id.* at 42–44. The Court rejected the argument that because the juror should never have been seated, "any information she shared with other jurors was extraneous," and thus the affidavit revealing her dishonesty was "admissible under Rule 606(b)(2)(A)'s exception for evidence as to whether 'extraneous prejudicial information was improperly brought to the jury's attention,'"[9] *id.* at 51, and the

---

[9] The Court observed that a central feature of the extraneous evidence inquiry is whether a matter is "internal" or "external" to a jury, and it found the challenged juror misconduct was "internal" and off-limits under Rule 606(b). *Id.* at 53. The Court explained the difference between "internal" and "external" matters:

> Generally speaking, information is deemed "extraneous" if it derives from a source "external" to the jury. "External" matters include

---

Court again declined to create a constitutional exception. *Id.* at 50–51. Yet in a footnote, the Court acknowledged possible "cases of juror bias so extreme that" they "abridged" the right to a jury trial, noting the emergence of such a case would force the Court to reexamine "whether the [*Tanner*] safeguards are or are not sufficient to protect the integrity of the process." *Id.* at 51 n.3.

The "extreme" case arose three years later. In *Peña-Rodriguez v. Colorado*, a state court jury convicted a Mexican man for sexual misconduct with two minor girls. 580 U.S. at 212. Two jurors approached defense counsel and swore affidavits alleging that another biased juror said the defendant was guilty for two inappropriate reasons: first, he told his fellow jurors that he believed the defendant "did it because he's Mexican and Mexican men take whatever they want," and second, he also told the other jurors that he believed the defendant's alibi witness was not credible based on his incorrect belief that the witness was "an illegal." *Id.* at 213. Yet even in the face of the juror's "apparent bias," the trial court and the Colorado Supreme Court both concluded there was no

<hr />

publicity and information related specifically to the case the jurors are meant to decide, while "internal" matters include the general body of experiences that jurors are understood to bring with them to the jury room.

*Warger*, 574 U.S. at 51.

35

basis to overcome the bar against impeaching verdicts in Colorado's version of Rule 606(b).[10] *Id*. at 213–14.

Reversing the Colorado courts, the Supreme Court held the juror's racial bias was the rare kind that let a court examine the verdict. *Id*. at 225.In the Court's two previous opinions construing Rule 606(b), the *Tanner* safeguards seemed appropriate to deal with the general categories of alleged misconduct involved. But the Court concluded racial bias was different. As Justice Kennedy wrote for the majority, racial bias is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice," and it had shown an unparalleled ability to evade the *Tanner* safeguards. *Id*. at 224–25. Thus, to obey the Fourteenth Amendment's "imperative to purge racial prejudice from the administration of justice," the Court declared that "[i]t must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons." *Id*. at 221. Given the uniquely insidious threat racial bias posed to the fairness of the jury system, the Court reasoned that the time  had come for a

---

[10] As the Court explained, Colorado's version of the no-impeachment rule is functionally identical to Federal Rule of Evidence 606(b), which "[l]ike its federal counterpart . . . generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict." *Peña-Rodriguez*, 580 U.S. at 213.

constitutional exception to Rule 606(b). *Peña-Rodriguez*, 580 U.S. at 225.

The Court held that "where a juror makes a clear statement that indicates he or she *relied on racial stereotypes or animus to convict* a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* (emphasis added). But it cautioned that "[n]ot every offhand comment indicating racial bias or hostility" justified an inquiry. *Id.* For the exception to apply, the challenged statements must show "overt racial bias that casts serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict" and must also show that "racial animus was a significant motivating factor in the juror's vote to convict." *Id.* at 225–26. The statements in *Peña-Rodriguez* easily met that standard. To start, the statements themselves showed an "egregious and unmistakable . . . reliance on racial bias" as the juror's reason to convict the defendant. *Id.* at 226. And the biased juror did not stop there: "[n]ot only did [he] deploy a dangerous racial stereotype to conclude petitioner was guilty and his alibi witness should not be believed, but he also encouraged other jurors to join him in convicting on that basis." *Id.*

The historical sweep of the Court's decision may be wide but the exception it announced is narrow, and the dissenting opinions convince us the exception is likely to remain that way. In a dissent joined by the Chief Justice and

37

Justice Thomas, Justice Alito urged that the fundamental reasons underlying the Court's reluctance to create a constitutional exception remained valid. He reasoned that our legal system operates on the background principle that losing certain "important evidence" is justified because "confidentiality is thought to be essential." *Peña-Rodriguez*, 580 U.S. at 235–36 (Alito, J., dissenting). Nowhere was that truer than the jury system and its reliance on secrecy and discretion to ensure "full and frank discussion in the jury room." *Id*. at 242 (cleaned up). That was why, "[f]or centuries, it has been the judgment of experienced judges, trial attorneys, scholars, and lawmakers that allowing jurors to testify after a trial about what took place in the jury room would undermine the system of trial by jury that is integral to our legal system." *Id*. at 236. Believing the Court had ignored that judgment, Justice Alito warned that opening the door to the jury room would subject jurors to harassment, lower public confidence in juries, and give jurors an incentive to change their minds after being "pressed for unanimity" during deliberations or facing a hostile reaction to the verdict from people close to them. *Id*. at 249.

The Court's insistence on a narrow exception has counseled our sister courts to decline invitations to stretch the exception beyond its narrow boundaries. *See, e.g.*, *United States v. Brooks*, 987 F.3d 593, 603 (6th Cir. 2021); *United States v. Norwood*, 982 F.3d 1032, 1057 (7th Cir. 2020); *United States v. Robinson*, 872 F.3d 760, 771 (6th Cir. 2017) (finding that the exception did not apply to evidence of White

foreperson's accusation that Black jurors' view of the evidence showed they were beholden to Black defendants).

## V.  DISCUSSION

Nucera raises several issues on appeal. First, he argues the District Court erred when it refused to hold an evidentiary hearing and denied his motion for a new trial based on his allegations of juror misconduct.[11] In addition, he says the District Court erred when it refused to let him identify Stroye as having made an out-of-court statement that purportedly showed someone else attacked him and did so in a different location. He also urges that the District Court confused the jury with its instruction about the unanimity required to convict him on Count Three for making false statements to the FBI. And finally, he urges that the District Court misread the Sentencing Guidelines when it used the cross reference provision in the guideline for false statements offenses to sentence him under the more punitive guideline for civil rights offenses and varied upward from the guideline. We only agree with Nucera's contention about the cross reference provision, so we will affirm the District Court in all other respects.

---

[11] We need not consider at any length the allegations of juror dishonesty during *voir dire*, because *Warger* instructs that "Rule 606(b) precludes a party seeking a new trial from using one juror's affidavit of what another juror said in deliberations to demonstrate the other juror's dishonesty during *voir dire*." 574 U.S. at 42.

### A. The District Court Did Not Err in Denying Nucera's Motion

Nucera claims the District Court should have granted a new trial or an evidentiary hearing based on alleged juror misconduct before and during deliberations. But his attempt to impeach the verdict runs headlong into Rule 606(b) and Supreme Court precedent.

As the Supreme Court explained in *Warger*, the no-impeachment bar applies generally "[d]uring an inquiry into the validity of a verdict," and a motion for a new trial based on juror misconduct "plainly entails" that inquiry. 574 U.S. at 44–45. Nucera mostly offers post-verdict juror statements to support his claim, and that evidence falls within Rule 606(b)'s general prohibition.[12] That being so, Nucera could only use the statements if they satisfied either the exceptions in Rule 606(b) or the Supreme Court's narrow constitutional exception for evidence of racial bias in *Peña-Rodriguez*. But the District Court correctly concluded the statements satisfied none. Only the allegation that Juror Six brought dictionary definitions into the jury room comes close to satisfying the exception for extraneous prejudicial information, but not close enough. We agree that Juror Six's conduct was improper, but we likewise agree it did not prejudice Nucera. The evidence shows the definitions related to the first two counts, Juror Six only showed them to the jury *after* Nucera's conviction on Count

---

[12] Richardson's Facebook post is the one piece of evidence that is not a post-verdict juror statement, and it therefore does not fall into the prohibition.

Three, and the jury did not convict Nucera on any count for which the definitions were used. So Nucera suffered no harm as a result.

Nor does the evidence show an improper outside influence affected the deliberations. Nucera points to several instances of alleged misconduct. He directs us to Richardson's stories of racial discrimination and purported threats to shoot other jurors, as well as instances of intimidation and accusations of racist behavior by some jurors. He also alleges that jurors intimidated one another and accused each other of being racist. The jurisprudence is clear that Rule 606(b) bars inquiry into "internal" jury matters and those "include the general body of experiences that jurors are understood to bring with them to the jury room." *Id.* at 51. Internal matters also include the less desirable things that jurors either bring with them to the jury room or that happen once inside. *See Tanner*, 483 U.S. at 121–22 (rejecting a claim based on drug and alcohol use); *Peña-Rodriguez*, 580 U.S. at 225 (explaining that not "every offhand comment indicating racial bias or hostility" triggers an exception to the no-impeachment bar). Rule 606(b) thus does not allow juror evidence of one juror's accusations of racism against another. Or even juror intimidation.[13] So the

---

[13] As we have explained, "[t]hough we hope that jury deliberations proceed in a manner respectful of every juror's opinion, rather than what allegedly occurred here, '[t]estimony concerning intimidation or harassment of one juror by another falls squarely within the core prohibition of the Rule.'"

District Court could not consider any of Nucera's evidence of juror misconduct under the Rule's exception to show an improper outside influence.

Finally, Nucera's evidence does not satisfy the *Peña-Rodriguez* exception for racial bias. That narrow exception applies only "where a juror makes a clear statement that indicates he or she *relied on racial stereotypes or animus to convict a criminal defendant*[.]" *Peña-Rodriguez*, 580 U.S. at 225 (emphasis added). Whether a juror has "made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict" is "a matter committed to the substantial discretion of the trial court," *Peña-Rodriguez*, 580 U.S. at 225–26, and we agree with the District Court that Nucera's evidence fails to meet that strict test. True, the affidavits and the *Inquirer* interview show jurors made pointed statements about race. But we agree that none of Nucera's evidence shows that a juror voted to convict *because of Nucera's race*. Nor do the juror affidavits show that "Juror Richardson's racial animus was a 'significant motivating factor' in her vote to convict." Reply Br. 1. Richardson said nothing about Nucera being White, let alone that she would vote to convict him *because* he was White. Instead, the evidence shows she believed Roohr and Guido were telling the truth about what happened: Nucera had done what Roohr and Guido said he did. As the District Court concluded, in so reasoning, she drew on her life experiences.

*Lakhani*, 480 F.3d at 185 (quoting *United States v. Stansfield*, 101 F.3d 909, 914 (3d Cir. 1996)).

She also found it troubling that her White colleagues did not share that viewpoint. The level and vehemence of her "trouble"—even outrage—is of no consequence at this point. Jury deliberations can be heated, but that is not a concern of the courts after the fact.

Similarly, we decline to hold that expressions of racial animus among jurors are enough to invoke the *Peña-Rodriguez* exception. On that, we agree with the Government that the Sixth Circuit's opinion in *United States v. Robinson* shows why we should reject Nucera's argument. There, the defendants sought a new trial after two Black jurors alleged that when they expressed doubt about the defendants' guilt, the White foreperson said that "she '[found] it strange that the colored women are the only two that can't see'" and that she thought they "were protecting the defendants because they felt they 'owed something' to their 'black brothers.'" *Robinson*, 872 F.3d 760, 768 (6th Cir. 2017). The district court denied the motions because Rule 606 barred use of the juror's statements to impeach the verdict. *Id*. at 769. The Supreme Court decided *Peña-Rodriguez* while their case was pending appeal, so the defendants urged the Sixth Circuit to find that its racial bias exception applied. *Id*. But the Sixth Circuit agreed with the district court that the foreperson's statement was not the "clear statement" *Peña-Rodriguez*[14] demanded. *Id*. at 770. And it

---

[14] The district court denied the defendants' motion because they gathered evidence of the foreperson's misconduct in "violation of both a local court rule and a specific admonishment from the bench not to contact jurors."

reasoned that even though the foreperson "impugn[ed] [the Black jurors'] integrity based on their shared race with the defendants, she never said anything stereotyping the defendants based on their race," much less that "she voted to convict [the defendants] *because they were African-American." Id*. at 771 (emphasis added).

To distinguish *Robinson*, Nucera urges that Richardson's statements were worse than the foreperson's comments there, and through those statements, she "demonstrated her own racial bias as a motivating factor in her vote to convict." Reply Br. 2. But Nucera has not shown that Richardson voted to convict him because he is White. Ironically, the closest thing Nucera offers is Juror Eleven's statement *to* Richardson and the other Black jurors—as Richardson recounts it in the *Inquirer* article—that "[t]he only reason you African American women are voting this way is because you're black." App. 163. But that falls short here, just as it did in *Robinson*.

Like the District Court, we also reject Nucera's alternative argument that *Peña-Rodriguez* applies to evidence that a juror convicted the defendant because of negative experiences they had based on their *own* race. Nucera does not offer a single case supporting that argument, and even if he did,

*Robinson*, 872 F.3d at 770. But the Sixth Circuit held that the exception in *Peña-Rodriguez* "would not apply even if the defendants had not" done so and the evidence "was properly before the district court." *Id*.

there is no clear evidence that Richardson or any other juror did so here.

Jurors faced off over a central question: who was telling the truth—Roohr and Guido, or the many witnesses the FBI interviewed? In answering that question, the jurors split over the version of events each of them would accept. As Richardson explained in the *Inquirer* article, the recording of Nucera's language persuaded her that Roohr and Guido were telling the truth, and Nucera was guilty of the crimes for which he was charged. She reached that conclusion based on her life experiences as a Black woman. Viewed in context, her statements do not satisfy the *Peña-Rodriguez* exception.

Accordingly, we hold that Rule 606(b) barred the District Court from considering Nucera's evidence of juror misconduct, and the District Court did not abuse its discretion in denying his motion for a new trial or an evidentiary hearing.

## B. The District Court's Hearsay Ruling Was Not Error

Nucera argues on appeal that the District Court improperly limited his ability to use Stroye's out-of-court statement about the incident at the hotel. The FBI interviewed Stroye during its investigation, and Nucera says the statement Stroye gave shows Nucera did not commit the alleged assault. Thus, the District Court should have let him confront an FBI witness with the fact that Stroye made the statement so that he could show that the FBI conducted a flawed investigation. We disagree.

On December 1, 2016, Stroye gave a statement to the FBI describing rough interactions with other BTPD officers at the scene. The FBI noted that Stroye recounted that, after the incident in the hotel hallway, he had been pushed "into the front door [of a police cruiser by] a white male with no facial hair and a 'military style', short haircut." App. 217. This description did not match Nucera, and it suggested that an officer other than Nucera had carried out the alleged assault in the hallway. Nucera moved to introduce Stroye's statement as evidence that the FBI did not investigate others for the alleged assault, though he assured the District Court he would not offer it for the truth of the matter asserted.[15] If introduced for the truth of what Stroye said, the statement would be inadmissible hearsay unless an exception applied. Yet even if the statement was admitted exclusively for Nucera's stated purpose, the jury would hear the statement for what it was—Stroye saying someone other than Nucera assaulted him. So the District Court had to decide whether the statement should be admitted as having come from Stroye, given the likelihood that the jury could not help but consider it for its truth.

Federal Rule of Evidence 403 gave the District Court an excellent tool to reason through the conundrum, and it applied the Rule's balancing test to weigh the unfair prejudice the

---

[15] This was the first time Nucera confirmed for the District Court his desire to introduce the statement, though Nucera had told the Government that he might seek to introduce it, and the Government had filed a motion in limine to preclude its admission, which the District Court denied without prejudice.

46

statement would create against its probative value to show the FBI's investigative shortcomings. The District Court concluded the former outweighed the latter and excluded the statement, though the Court let Nucera confront the FBI's witness with its substance as showing the FBI's failure to follow up. Nucera contends on appeal that the District Court erred in its Rule 403 analysis because it failed to identify the prejudice the Government would suffer if the statement were admitted. He also contends that the District Court erred by not concluding that the "trustworthiness" exception to hearsay applied.

Nucera's argument on Rule 403 faces two problems. First, he never objected to the District Court's Rule 403 balancing, thus waiving his argument that the District Court did not explain the prejudice. So we review for plain error. That standard requires Nucera "to show that there is: (1) an error; (2) that is 'clear or obvious'; and (3) that 'affected [his] substantial rights.'" *United States v. Gonzalez*, 905 F.3d 165, 182–83 (3d Cir. 2018). The standard imposes a difficult burden.

The second problem is that the District Court did not err at all, let alone plainly. The Supreme Court has explained that "[t]he primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." *Anderson v. United States*, 417 U.S. 211, 220 (1974). That diminished opportunity was precisely the prejudice Nucera's use of the statement created: it would have

47

eliminated the Government's ability to conduct a meaningful cross-examination of the declarant, Stroye. And the District Court signaled that inability would be fatal when it told Nucera that Stroye "is available today if you want to put him on the stand." Supp. App. 940. Yet Nucera chose not to call Stroye as a witness. So the District Court was correct that the prejudice of admitting the statement outweighed any value to Nucera of pointing out that the FBI did not follow up on leads or other suspects, and Nucera was able to make that point by attacking the FBI's investigation in other ways.

Moreover, the District Court satisfied our requirements for a proper Rule 403 balancing. Though "[w]e prefer that the district court show its work" in a Rule 403 balancing, "we will affirm so long as it makes clear that it did the weighing itself." *United States v. Heatherly*, 985 F.3d 254, 265 (3d Cir. 2021). The District Court did so here by concluding on the record that the balance of probative value and unfair prejudice tipped heavily toward the latter and then excluding the statement on that basis. Having shown its work, we will affirm the District Court's ruling.

Nucera also urges that the statement qualified for the exception to hearsay found in Federal Rule of Evidence 807. That exception lets a court admit an otherwise inadmissible hearsay statement if the statement "is supported by sufficient guarantees of trustworthiness" and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). We have cautioned that this "residual exception"

48

applies "only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978). Nucera apparently made this argument in a brief he sent to the District Court at 1:30 am on the morning of the hearing and did not docket until five days later, all while never raising Rule 807 at the hearing. So he arguably waived the argument, but in any case, it fails on its own terms.

Nucera urges there are several reasons to find Stroye's statement trustworthy under Rule 807 based on the circumstances under which he made it, namely Stroye made the statement in the comfort of his own home, and with his attorney present; he faced criminal penalties under 18 U.S.C. § 1001 if he lied; he had no motive to lie; and he confirmed the same version of events in his meetings with agents and prosecutors. But trustworthiness has as much to do with the circumstances of the declarant's observation of the matter as it does with the circumstances of making the statement after the fact. Nucera addresses only the latter. But there are clear reasons to question the former: among other things, the Government urges that Stroye had been pepper sprayed, affecting his ability to see who pushed him. Also, the Government's theory of the event was that the attack happened from behind. All of that undermines Nucera's contention that Stroye's statement was trustworthy.

Perhaps more importantly, a hearsay statement is only admissible under Rule 807 if "it is more probative on the point for which it is offered than any other evidence that the

proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). Stroye was available to testify, and his in-court testimony about who assaulted him would have been more probative on that point than the hearsay statement would have been. Accordingly, Stroye's statement was not admissible under Rule 807.

Whether or not Stroye's statement could have been admitted under the hearsay rule, the District Court would still have been correct to exclude it based on Rule 403 because the lack of opportunity for cross-examination risked unfair prejudice that outweighed its probative value. So we find no error in the District Court's ruling, and we will affirm.

### C. The Unanimity Instruction Was Not Confusing

Nucera next argues that the District Court erred by "confusing" the jury with its instruction about the specific unanimity required to convict Nucera for giving a false statement. Nucera Br. 49. He claims that the District Court's final instruction could have led jurors to believe that "each individual juror must find that at least one—as opposed to all—of the four allegedly false statements were made by Appellant, but not that all jurors had to be unanimous as to which of the statements was made." Nucera Br. 50.

Federal Rule of Criminal Procedure 30 puts an important limit on appellate claims that a jury instruction was improper:

No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

*United States v. Russell*, 134 F.3d 171, 178 (3d Cir. 1998) (quoting Fed. R. Crim. P. 30). As we explained in *Russell*, Rule 30 exists "to provide the district court an opportunity to correct potential problems in jury instructions *before* the jury begins its deliberations." *Id.* (citing *United States v. Logan*, 717 F.2d 84, 91 (3d Cir. 1983)) (emphasis added).

Rule 30 governs the outcome here. Before instructing the jury, the District Court held a charging conference with the parties during which Nucera persuaded the Court to give a more precise unanimity instruction. The District Court obliged Nucera again when something in the Government's closing troubled Nucera. Both times, the District Court did precisely what Nucera asked and the way he asked it be done. Nucera never objected. Once the jury retired to deliberate, Rule 30 barred any challenge to the instructions. Because Nucera failed to challenge the instructions before deliberations, we review for plain error, *id.* at 180, and on this record, we find none.

Before giving his summation, and with the jury excused, Nucera raised his concern that the jury instruction may not have clearly communicated that, to convict, the jury

51

must be unanimous in concluding that any of the statements were false. When the jury returned, the District Court clarified the false statements instruction as Nucera requested:

> THE COURT: All right. Have a seat, ladies and gentlemen. Before we hear from [Nucera's counsel], I just want to make sure I made myself clear.
>
> Charge 36, about the false statements, and I said you only need to find –you're going to have to find one of the four [statements] to have met all of the five elements. Remember, your vote has to be unanimous as to those.

Supp. App. 1196. We discern no error in the District Court's instruction, let alone a plain one, and we note that, apart from urging juror confusion based on the affidavits, Nucera points to no case that casts doubt on the correctness of the instruction given here.

So we will affirm the District Court's instruction.

## D. The District Court Erred in Part in Its Application of the Guidelines

The District Court sentenced Nucera on May 26, 2021. The Presentence Investigation Report (PSR) calculated "an offense level of 12" and assigned Nucera a criminal history

category of one "because [he had] no criminal record, yielding a recommended sentence of 10 to 16 months." App. 28. To reach its offense calculation, the PSR began with the base offense level of 6 required by § 2B1.1(c)(3), "[t]he guideline for a violation of 18 U.S.C. § 1001(a)(2)." PSR ¶ 26. It then used the provision in § 2B1.1(c)(3) permitting a cross reference when "the conduct related to the count of conviction establishes an offense specifically covered by another guideline in Chapter Two." PSR ¶ 26. Based on that provision, the PSR concluded that because the count of conviction asserted that Nucera's lie was about his civil rights violation, it was appropriate to cross reference the civil rights guideline § 2H1.1, which resulted in an increase of 6 offense levels. The District Court accepted the guideline calculation, and it varied from the guideline based on the nature of Nucera's lies, as we discuss below, to impose a sentence of twenty-eight months.

As for the application of the cross reference provision, the District Court noted that there was "very little law on [the] subject" and that the issue "ha[d] not come up very often on this specific cross reference." App. 38. The District Court believed that the Supreme Court had eased the interpretive task by issuing recent guidance that sentencing courts could apply an unambiguous guideline using its plain text. And in the District Court's view, § 2B1.1(c)(3)'s directive was clear: if the "conduct set forth in the count of conviction establishes an offense specifically covered by another Guideline in Chapter 2 . . . apply that other Guideline." App. 38. The District Court agreed with the Government that Count Three included the acts of the civil rights violation "because [that count] specifically

refer[ed] to the incident in which [Nucera] slammed [Stroye's] head into the [doorjamb] during the arrest after [Stroye] had been restrained and handcuffed." App. 38–39. So the Court overruled Nucera's objection and found that the PSR was correct to use the cross reference from § 2B1.1(c)(3) to § 2H1.1.

In short, the District Court held that, because Count Three contained language related to the assault, the conduct in that count established a civil rights violation and permitted a cross reference to the civil rights guideline. But we believe that the cross reference should not have applied. Section 2B1.1(c)(3) instructs that "[i]f . . . the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally [and] the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two . . . apply that other guideline." The District Court was right that there is little guidance on how to apply the provision, and we note this is a case of first impression in our Court. But the available caselaw compels us to read the cross reference more narrowly than the Government and the District Court.

At issue is the meaning of the phrase "[i]f the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline." § 2B1.1(c)(3). The opinions of our sister courts help illuminate that meaning. In *United States v. Arturo Garcia*, 590 F.3d 308 (5th Cir. 2009), the defendant lied to border officials about the status of an undocumented Mexican woman he tried to drive across the

U.S.-Mexico border in his pickup truck. *Id.* at 310. The count of conviction alleged the defendant "made a false statement about his passenger's citizenship to a border officer in an attempt to aid the female passenger's entry into the United States." *Id.* at 316. Based on that conduct, the district court cross referenced § 2B1.1(c)(3)(C) to § 2L1.1, "which specifically covers Smuggling, Transporting, or Harboring an Unlawful Alien." *Id*. at 313.

The Fifth Circuit affirmed the cross reference because the sole count of conviction alleged Garcia lied to the border officer "in an attempt to aid the female passenger's entry into the United States," and the "alien-smuggling statute, § 1185(a)(2), expressly covers this conduct when it makes it a crime for any person to transport or attempt to transport from or into the United States another person with knowledge or reasonable cause to believe that the departure or entry of such other person is forbidden by this section." *Id.* at 316 (cleaned up). Thus, the lie itself "established" the offense of aiding the passenger's entry into the United States. Said another way, the conduct of lying to federal officials constituted the cross referenced offense of attempting to aid the illegal entry.

The defendant in *United States v. Genao*, 343 F.3d 578, 581 (2d Cir. 2003), was similarly convicted of making a false statement under 18 U.S.C. § 1001, and the count of conviction alleged that he made a false innocence proffer to federal investigators about when he knew that certain funds came from illegal sources. The Government sought a cross reference to the obstruction of justice guideline on the theory that the defendant

55

lied to investigators so that they would not convene a grand jury to indict him. *Id*. There was no general challenge to the application of the cross reference, but the defendant convinced the court that the charged conduct had to establish the *exact elements* of the offenses underlying the obstruction of justice guideline. *Id.* at 582–83. Because the lying offense as charged did not include all the elements of the obstruction offenses, the Second Circuit affirmed the district court's refusal to apply the cross reference. *Id*. at 585–86. Thus, the Court held that the lie did not establish the second offense just because it obstructed justice; the lying as charged also had to include and establish all the elements of the obstruction offenses for the cross reference to apply. *Id*.

These two cases suggest that the conduct of lying must *constitute* the cross referenced offense. In *Garcia*, the lying constituted aiding the entry of an undocumented person, while in *Genao*, the lying did not constitute obstruction. The cases tell us "establish" means "constitute" or "equate to." We hold that a cross reference under § 2B1.1(c)(3) is appropriate only when the defendant's conduct of making the false statement itself constitutes or establishes the offense addressed in the other guideline.[16] Here, the lying did not constitute, or

---

[16] The District Court's view that "the conduct set forth in the count of [Nucera's] conviction" included conduct other than lying could raise concerns that the cross reference provision is ambiguous. But the parties have not urged this interpretation. And even if we examined the text, structure, history and purpose of the cross reference provision to confirm its

establish, the civil rights violation. Instead, Nucera lied *about* whether he had committed a civil rights violation.

Nucera's situation is similar to *United States v. Bah*, 439 F.3d 423, 426 (8th Cir. 2006). Bah pled guilty to making false statements under 18 U.S.C. § 1001 for his involvement in a fraudulent immigration documents scheme. *Id.* The count of conviction alleged Bah falsely told "an Immigration and Customs Enforcement agent that he did not know the purpose of his and [an accomplice's] overnight trip to Iowa from Maryland, when in truth and in fact, [Bah] knew the purpose of the trip was to pick up a package at the Post Office in Cedar Rapids, Iowa" containing fraudulent immigration documents used to obtain visas from foreign consulates. *Id.* at 427–28. The district court relied on testimony from an Immigration and Customs Enforcement (ICE) agent to cross reference "the more punitive guideline of § 2L2.1 (the sentencing guideline for trafficking in immigration documents or making a false statement with respect to the immigration status of another)." *Id.* at 426.

The Eighth Circuit held that the district court erred in using the cross reference. Even though the ICE agent's

---

ambiguity, as our precedent instructs, *see United States v. Adair*, 38 F.4th 341, 349 (3d Cir. 2022); *United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (en banc), we would still conclude that the provision is not genuinely ambiguous, and we would also conclude that our interpretation limiting the conduct to lying is the correct one.

57

testimony showed Bah violated something more serious than 18 U.S.C. § 1001, "the conduct set forth in the count of conviction" still failed to "establish that Bah committed an offense punishable pursuant to § 2L2.1." *Id.* at 428. Bah lied about what he knew, but that lie did not constitute either of the offenses the district court cross referenced under § 2L2.1. Similarly, here, Nucera lied about what he did, but his lie does not constitute or establish a civil rights violation. We therefore conclude that the District Court should not have applied the cross reference to increase Nucera's offense level, and we will remand for resentencing.[17] Because we are vacating Nucera's

---

[17] Application Note 17 buttresses our conclusion that the cross reference does not apply here:

> Cross Reference in Subsection (c)(3).—Subsection (c)(3) provides a cross reference to another guideline in Chapter Two (Offense Conduct) in cases in which the defendant is convicted of a general fraud statute, and the count of conviction establishes an offense involving fraudulent conduct that is more aptly covered by another guideline.

But we need not rely on this note as we find no ambiguity in the guideline itself. *See, e.g.*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–16 (2019).

sentence, we need not address his challenge to its substantive reasonableness.

## VI. CONCLUSION

For the reasons above, we will affirm the District Court's denial of Nucera's motion for a new trial or an evidentiary hearing, as well its evidentiary ruling and its instructions to the jury about unanimity. But we will vacate the District Court's sentencing order and remand for further proceedings consistent with this opinion.

*United States of America v. Frank Nucera, Jr.*, No. 21-2115
_____

JORDAN, *Circuit Judge*, concurring.

I join today's opinion but write separately to underscore the duty of trial courts to contemporaneously investigate credible allegations of juror misconduct.

As our opinion explains, the Supreme Court in *Pena-Rodriguez v. Colorado* identified a narrow constitutional exception to the no-impeachment rule embodied in Federal Rule of Evidence 606(b). The Court there said the "Sixth Amendment requires that the no-impeachment rule give way" where "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant[.]" 580 U.S. 206, 225 (2017). In other words, the constitutional exception is triggered only by a juror's statement that the juror voted to convict based, in some significant measure, on the defendant's race.

That exception was and remains the single constitutional limitation on the no-impeachment rule. Although adopted by Congress in 1975 when it approved Rule 606(b), Pub. L. No. 93-595, § 1, 88 Stat. 1926, 1929-1948 (1975), the no-impeachment rule has existed for centuries at common law, affording finality and stability to jury verdicts. *Pena-Rodriguez*, 580 U.S. at 215, 217-18; *see also McDonald v. Pless*, 238 U.S. 264, 267 (1915) ("[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of

1

discovering something which might invalidate the finding."). If finality in our trial-by-jury system is to be maintained, courts must resist expanding the constitutional exception, even when faced with evidence of juror misconduct.

Knowing that, however, does not make this an easy case for me. On the contrary, the circumstances that came to light after the verdict here are so disturbing it is hard to let the verdict stand. If the sworn statements of four separate jurors are to be believed, Juror Pamela Richardson berated and threatened white jury members in her effort to strongarm them into convicting Nucera. They allege that she repeatedly called them racists, that she said they were inclined to acquit Nucera because of their racism, and that they would only be happy with an all-white jury. She allegedly declared that, "[e]very time I hear someone in this room say 'I'm not prejudiced, I have a black friend[,'] if I had a gun, I would shoot each one of you." (App. at 176 (Juror 3 Affidavit); *accord* 184 (Juror 4 Affidavit) ("[You just don't know. I could shoot you all."), 197 (Juror 2 Affidavit) ("You are lucky I don't have a gun because I would shoot some of you."), 204 (Juror 11 Affidavit) (same).)

Due to what one juror described as an atmosphere of "bullying, racial tensions, and unfounded accusations[,]" (App. at 166-67 ((Juror 3 Affidavit)), and to avoid being branded as racists, the four affiant-jurors voted to convict Nucera on Count Three, even though they now assert that they believed him to be innocent. (App. at 167 (Juror 3 Affidavit) ("As the deliberations progressed, I felt like I was being labelled as a racist if I did not find Frank Nucera guilty beyond a reasonable doubt."); 176-77 (Juror 3 Affidavit) ("I was … particularly [troubled by] the accusations of racism directed at me … I was essentially shamed into voting guilty regarding Count Three,

2

despite that I did not want to do so."); 185 (Juror 4 Affidavit) ("[H]er comment … made me feel like I was being racist to vote not guilty, even though not guilty was my true belief from the evidence."); 195 (Juror 2 Affidavit) ("Ultimately, affected by all of the foregoing, I regrettably compromised my prior Not Guilty vote on Count 3 and changed it to Guilty."); 208 (Juror 11 Affidavit) ("This conduct and the comments by some other jurors … increasingly made me feel that the other jurors were perceiving me as a racist simply because I was voting not guilty.").)

In sum, it is alleged that Richardson, instead of endeavoring to convince the other jurors to convict Nucera based on evidence of his guilt, sought to improperly achieve her desired outcome by hurling race-based accusations and threats around the jury room. Guilty or not, Nucera, like all criminal defendants in our constitutional order, deserved an unbiased jury of his peers, people who would discuss the case, not each other's skin color. And he was likewise entitled to jurors who would be influenced solely by the evidence and persuasive force of proper argument, not by threats and vituperation. If what the other jurors have said about Richardson's remarks and about their own votes is true, he didn't get that. Richardson stopped short of announcing that she was voting to convict Nucera because he is a white man, but, given that Nucera was charged with a racist hate crime, there is a terrible irony in the racially charged language that is said to have poisoned the jury deliberations.

As bad as the allegations about Richardson's statements are (and they are, I recognize, only allegations; she would likely give a different account of her remarks, but I am taking the allegations as true for purposes of this discussion), they

3

nevertheless do not amount to a clear statement about her vote to convict, as *Pena-Rodriguez* demands. Indeed, given the appalling evidence of Nucera's racism and abuse of authority, one could conclude that Richardson would have been just as threatening and noxious in her comments during jury deliberations if Nucera had not been white.

Nor did the four jurors who took the brunt of Richardson's animus make any clear statements that their votes to convict were based on Nucera's race. As today's opinion points out, their statements instead show that they convicted him for fear of being themselves branded as racist. That is a distinction with a serious difference. *See Pena-Rodriguez*, 580 U.S. at 225-26 (holding that, for the no-impeachment rule to give way, "there must be a showing that one or more jurors made statements exhibiting overt racial bias," and that the overtly hostile statement show that "racial animus was a significant motivating factor in the juror's vote to convict").

This case therefore illustrates the unsettling reality that there may simply be no remedy for juror misconduct if it comes to light too late, even when there is a real chance that the misconduct has undermined a defendant's due process right to "a jury capable and willing to decide the case solely on the evidence before it[.]" *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Because of the countervailing value our society places on the confidentiality and finality of jury deliberations, a value of such high importance that it is given the force of law in Rule 606(b), we are generally not free to correct even egregious wrongs once the jury has rendered its verdict. Although "we hope that jury deliberations proceed in a manner respectful of every juror's opinion," testimony "concerning intimidation or harassment of one juror by another falls squarely within the

4

core prohibition of the Rule." *United States v. Lakhani*, 480 F.3d 171, 185 (3d Cir. 2007); *see also id.* at 184 ("[E]vidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.")

Fortunately, defendants have "other sources of protection" for their "right to a competent jury." *Tanner v. United States*, 483 U.S. 107, 127 (1987). First, trial courts and counsel have the opportunity to examine the "suitability of an individual for the responsibility of jury service … during *voir dire*." *Id.* Second, "during the trial the jury is observable by the court, by counsel, and by court personnel." *Id.* And third, "jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict." *Id.*

Without vigilance on the part of trial participants and court personnel, however, these sources of protection can end up being ineffectual. Here, Juror 2's affidavit states that she twice attempted to alert the District Court about "disrespect and racial comments that were being made in the jury room during deliberations." (App. at 194.) She says she told the Deputy Clerk "that some of [the] jurors were being called racists by other jurors[,]" to which the Deputy Clerk responded that, "if [she] had any further issues, [she] should write a note to the [j]udge." (App. at 194.) That response suggested the only avenue by which Juror 2 could communicate improper conduct to the District Court was by a written note delivered through the jury foreperson. After being rebuffed by the Deputy Clerk, Juror 2 understandably declined to write a note because she feared other jurors' reactions if the foreperson read

5

the note aloud. The result was that a serious problem that should have been promptly addressed was not.

Once Richardson made her comment about shooting other jurors, Juror 2 again contacted the Deputy Clerk, explaining that the atmosphere "had gotten worse." (App. at 198.) This time, the Deputy Clerk informed the presiding judge, who then met with the jurors in their assembly room. Juror 2 stated in her affidavit that she could not remember whether she specifically mentioned Richardson's threat, but she did recall crying as she "told the [j]udge that there was serious disrespect going on in the jury room." (App. at 198.) The District Judge, widely and rightly respected, is said to have advised the jurors that "personal feelings [had] to be left out of the deliberation room[.]" (App. at 199.) Had he known of threats, he would surely have inquired further, but, at this juncture, we can only guess what he was told. Whatever it was, though, was not plain enough to convey what we are being told now. Again, timing matters.

If we are to maintain the careful balance between protecting a defendant's right to a competent jury and respecting the post-verdict confidentiality and finality of jury deliberations, jurors must promptly and clearly report misconduct, and court personnel in turn must promptly report allegations of jury misconduct to the trial judge. If the judge learns of serious misconduct before the jury delivers its verdict, there should then, of course, be an immediate investigation adequate to address the seriousness of the allegations. *Cf. Smith* at 217 ("[A] trial judge [must be] ever watchful to prevent prejudicial occurrences *and to determine the effect of such occurrences when they happen*." (emphasis added)). Although Rule 606(b) protects the finality of verdicts, neither

6

its express terms nor its purpose prevents inquiry into juror misconduct before a verdict is rendered.